IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

DIANE RENEE GRAY, )
                 )
         Plaintiff, )   TC-MD 170092G
                 )
     v. )
                 )
LINN COUNTY ASSESSOR, )
                 )
         Defendant. )   **FINAL DECISION**[1]

This is an appeal of a residential property's adjudicated value under ORS 309.115. At issue are the 2015–16 and 2016–17 tax roll values of property identified as account 219358 (subject property). Trial was held on June 28, 2017, and post-trial briefing was completed on July 20, 2017. Randy A.C. Gray (Gray), Plaintiff's husband, appeared and testified on her behalf. Geoff Tracy (Tracy), Property Appraiser, appeared on behalf of Defendant. Both Tracy and Joshua Garton (Garton), Property Appraiser, testified on behalf of Defendant. Plaintiff's Exhibits 1 to 76, 81, and 82 were received without objection. Plaintiff initially offered and then withdrew an exhibit 83. Plaintiff's Exhibits 31 and 32 were corrected versions that replaced those previously exchanged, with Defendant's consent. Defendant's Exhibits A to H were received without objection. Defendant's exhibits were the renumbered versions that replaced those previously exchanged, with Plaintiff's consent.

/ / /

/ / /

/ / /

---

[1] This Final Decision incorporates without change the court's Decision, entered December 21, 2017. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

## I. STATEMENT OF FACTS

A.      *Subject Property Description and Valuation History*

The subject property was a 4,330-square-foot home located on 5.40 acres in the hills of a neighborhood outside of Lebanon.[2]  Like other houses in its area, the subject property had problems obtaining water.  Two wells had been drilled on the subject property, but it seems that the Grays were unable to use any water from those wells due to deficiencies in both water flow and water quality.[3]  The Grays, who lived at the subject property, collected rainwater and had more water delivered by truck for storage in a cistern and other portable tanks.

The residence was constructed in 2008.  (Def's Ex H at 1.)  It had some nonstandard design features, owing to its having originally been built as a general purpose building.  Gray testified that the walls to some bedrooms did not reach the ceiling and that the house was entirely reliant on wall heaters because it had no central heating system.[4]  At some time before 2012, a 32-by-40-foot shop with a loft was added to the subject property.

In 2012, the Grays bought the subject property from a bank for $182,500 in cash.  According to a spreadsheet provided by Plaintiff, Defendant originally set the 2012–13 tax roll real market value at $350,710.  (Ptf's Ex 74.)  The Grays appealed that value to the Linn County Board of Property Tax Appeals (BOPTA) and prevailed; BOPTA issued an order setting the 2012–13 real market value at the Grays' $182,500 purchase price.  Defendant did not appeal that BOPTA order.

---

[2] All but one acre of the subject property was under forestland special assessment during the relevant years. The subject property's special assessment status was not an issue in this case.

[3] During his cross-examination of Defendant's witness, Gray stated that no well water from the subject property was used.  Although Gray's statement was not made under oath, it was consistent with his earlier testimony about the water quality and flow rate.

[4] During his cross-examination of Defendant's witness, Gray also stated that lights for two bedrooms turned on with a single switch, and that the front door opened into the kitchen.

In 2013, Gray—who is a licensed contractor—personally began constructing a general purpose outbuilding (the "pole barn") on the subject property. Defendant's appraiser photographed the structure in November 2013 and determined that its concrete floor, poles, trusses, roof, and gutters had been built. (Def's Ex E at 1.) Defendant's appraiser determined the structure was 70 percent complete at that time. (*Id.*)

In 2014, Gray completed construction of the pole barn with additional framing for the large end doors, metal siding, and a downspout as part of a rainwater collection system. (Ptf's Ex 7; Def's Ex E at 2.)

Defendant valued the completed pole barn at $34,810. (Def's Ex B at 2.) Defendant added 70 percent of the pole barn's value ($24,050) to the 2014–15 tax roll and 30 percent of its value ($10,410) to the 2015–16 tax roll, increasing the maximum assessed value proportionally each year.

Defendant also added real market value to the subject property each year due to trending derived from its annual ratio studies. Defendant's trend for 2015–16 was 4 percent, resulting in additional value of $9,280. (*See* Def's Ex B at 2.) Defendant's trend for 2016–17 was apparently 15 percent, judging from a value increase of $34,630.

Plaintiff appealed the subject property's 2016–17 tax assessment to BOPTA. BOPTA issued an order sustaining the tax roll values, and Plaintiff appealed to this court. Plaintiff's Complaint requested a reduction in the subject property's real market values for 2014–15, 2015–16, and 2016–17 as follows.

| Tax Year | 2014–15 | 2015–16 | 2016–17 |
|---|---|---|---|
| Tax Roll RMV | $207,030 | $226,720 | $261,350 |
| Requested RMV | $171,569 | $176,030 | $180,607 |

/ / /

Following a motion to dismiss by Defendant, the court dismissed Plaintiff's appeal of the 2014–15 year because the requested real market value differed by less than 20 percent from the roll value. At trial, Plaintiff revised her requested 2015–16 and 2016–17 real market values upwards. Plaintiff's revised requests are as follows.

| Tax Year | 2015–16 | 2016–17 |
|---|---|---|
| Tax Roll RMV | $226,720 | $261,350 |
| Requested RMV | $209,561 | $212,332 |

B.    *Valuation Evidence*

Plaintiff presented evidence of the pole barn's value and of the trend applicable to the subject property. Defendant presented evidence of the pole barn's value and of the entire property's value.

1.    *Pole barn*

The parties agreed the pole barn was 2,400 square feet, with 16-foot walls and a 4-inch concrete slab floor. It was not plumbed for water. Both parties used the cost method, and only the cost method, to value the pole barn.

On behalf of Defendant, Tracy developed a range of value by computing cost using three different data sets: the Department of Revenue's 2009 cost factor book, Marshall & Swift, and estimates from local contractors. (Def's Exs B, C, D, G.) For purposes of the state cost factors, Tracy determined the pole barn's construction quality and design features—such as its concrete slab floor—qualified it as a class 5 general purpose building. (*See* Def's Ex B at 4.) Tracy calculated the pole barn's total real market value was $34,810 using the state cost factors, or $14.50 per square foot. (Def's Ex B at 2.) For purposes of Marshall & Swift, Tracy determined the pole barn's floor and doors rendered its quality closer to "average" than to "low cost." (Def's Ex D at 1.) After applying the tabled discount for lack of water, Tracy calculated a real

market value for the pole barn of $32,375 using Marshall & Swift—about $13.50 per square foot. (*Id*. at 6.) Tracy also presented a table of data received from local contractors, from which he derived an average cost to construct a pole barn of $17.50 per square foot.[5] (Def's Ex G at 2.) Tracy found that the result from the state cost factors was credible because it fell within the range of indicated values. He concluded the pole barn's real market value as complete was $34,810.

On behalf of Plaintiff, Gray computed the pole barn's value using the state cost factors data and the Marshall & Swift tables provided by Defendant. (Ptf's Exs 2–3, 8–9.) In applying the state cost factors, Gray agreed the pole barn was class 5. He used slightly different numbers than Tracy—he interpolated the tabled height adjustment and applied a lower trending value (2.6 percent)—and reached a slightly lower initial indicated value for 2015: $33,915. (Ptf's Ex 3.) Gray then applied a 48 percent "obsolescence" reduction to compensate for the subject property's nonstandard design features and its overall lack of water. The 48-percent figure was derived from BOPTA's reduction of the subject property's tax roll real market value by 48 percent following its sale in 2012. After reducing the pole barn's indicated value by 48 percent, Gray concluded that the completion of the final 30 percent resulted in $5,291 in additional real market value. (Ptf's Ex 3.) However, Gray placed no reliance on the state cost factors because the value calculated before obsolescence was "more than 30 [percent] higher than the actual costs." (Ptf's Ex 1.) Gray did not provide evidence of the actual cost and did not specify whether he included labor in his calculation of actual cost.

/ / /

---

[5] Testimony on local contractor data was limited. For reasons that are unclear, it appears Tracy took the average of three pole structures and one steel component structure, and disregarded three other pole structures (one of which did not show average cost) and one other steel component structure. The average cost of all the pole structures on the table for which there was data was $16.60 per square foot.

Using the Marshall & Swift tables, Gray calculated cost for both "average" and "low cost" qualities. Gray's calculation largely resembled Tracy's—Gray interpolated a slightly higher story height multiplier and applied a lower trending value (1.1 percent)—except for two major adjustments. First, Gray reduced the floor area multiplier by 30 percent on the basis of the following instruction from the Marshall & Swift tables under the heading "Farmer-Built Construction."

> "All costs in this section are based on professional labor supervised by a contractor or his job foreman. For amateur workmanship or work done by farm, grower or ranch help, costs should be decreased by 15% to 30% to reflect the proper wage rate and lack of supervision relative to the quality of work."

(Def's Ex D at 2.) Second, as with his state cost factor analysis, Gray applied a 48-percent obsolescence reduction. His final value was the value of 50 percent of the pole barn rather than 30 percent: $6,530 for "average" and $4,684 for "low cost." (Def's Exs 8, 9.) Gray did not recalculate the indicated value based on 30 percent to be completed in 2015 because (a) he believed it was 50 percent and (b) either number was below the statutory "minor construction" limit.

In defending his obsolescence adjustment on cross-examination, Gray argued that the pole barn was a superadequacy for a property without water. As evidence, he provided data for two 2016 sales of small acreage properties in the vicinity of the subject property: one on Edgemont Drive and another on 5th Street. The Edgemont Drive property was a 2-bedroom doublewide mobile home with 1,152 square feet on 4.8 acres without water that sold for $220,000 in May 2016. (Ptf's Ex 56.) The 5th Street property was a 3-bedroom home with 1,647 square feet on 4.57 acres that sold for $455,000 in September 2016. (Ptf's Ex 58.) Gray did not make adjustments to the sale prices. He concluded that the 55 percent difference in sale price between the two properties was entirely attributable to the lack of water at Edgemont

Drive. On rebuttal, Tracy testified that lenders would not finance the sale of a twice-moved mobile home such as the Edgemont Drive property, and that financing was only obtained at last through the U.S. Department of Veterans Affairs.

Gray testified that the pole barn was 50 percent complete as of January 1, 2015, rather than 70 percent as found by Defendant's appraiser. At that time, the framing around the end doors had not been completed, and the metal siding had not been installed. Gray wrote that the framing around the end doors required more labor than the other framing. (Ptf's Ex 7.) He provided a printout from a 2015 residential properties data collection manual from Lexington, Massachusetts, that assigned percent completion rates to various components of a home. (Ptf's Exs 13–14.) He also provided a printout from BuildingAdvisor.com showing a draw schedule for a "2000 [square foot] custom home." (Ptf's Exs 15–17.)

Tracy testified that the appraiser's determination of 70 percent completion as of January 1, 2015, was reasonable because pole barns do not have all the features that homes do. Both of Gray's printouts assigned completion percentages to features found in homes but not in Plaintiff's pole barn, such as foundations, decks, plumbing, and drywall.

2.    *Trending*

Tracy testified that Defendant applied annual trending as part of its mass appraisal efforts on the basis of annual ratio studies covering many properties. Defendant applied a trend of 4 percent in 2015–16 and 15 percent in 2016–17.

Gray developed a trend of 1.3 percent for both years on the basis of two sales of the neighboring mobile home at Edgemont Drive, which had water problems similar to the subject property. Gray testified that Edgemont Drive had sold for $180,000 in 2013 and $220,000 in 2016. (Ptf's Exs 56, 75.) After increasing the 2013 sale price by $26,000 to reflect

improvements made by the owner after the sale, and decreasing the 2016 sale price by $7,000 to reflect the seller's payment of closing costs, Gray calculated that the Edgemont Drive property had increased in value by 3.9 percent over three years, or 1.3 percent per year. (Ptf's Ex 75.)

3.   *Entire property*

Defendant submitted an appraisal of the subject property without an indicated value that showed an "average" value of $389,000 on the basis of four comparable sales. (Def's Ex H at 1.) Defendant's appraiser, Garton, testified that the subject property's market value was significantly higher than its tax roll value due to the BOPTA adjudication in 2012.

## II. ANALYSIS

The issue in this case is by how much the subject property's real market value should be increased pursuant to ORS 309.115 due to annual trending and the addition of the pole barn.[6] Exception value is at issue for 2015–16 only.

A.   *Adjudicated Value*

After a property's real market value is changed by order of the Department of Revenue, BOPTA, or a court, the county assessor's authority to change that value is limited for the next five years. ORS 309.115(1). During that period, the real market value of the property on the assessment and tax roll is known as an "adjudicated value." OAR 150-309-0210(1). An adjudicated value can be changed only as provided in ORS 309.115(2), the relevant portion of which follows.

> "(2) Notwithstanding subsection (1) of this section, the following adjustments may be made to the real market value during the period described in subsection (1) of this section:

/ / /

---

[6] The court's references to the Oregon Revised Statutes (ORS) are to 2013. The relevant statutes did not materially change over the years at issue.

"(a) Annual trending or indexing applied to all properties of the same property class in the county, or within clearly defined areas of the county under this chapter.

"(b) Annual trending or depreciation factors applied to similar property.

* * * * *

"(e) Increases directly related to additions, remodeling or rehabilitation made to property."

ORS 309.115(2).

When appealing a property with an adjudicated value, taxpayers must decide whether to put at issue the entire property value or just the adjustments made under ORS 309.115. *Pacificorp v. Dept. of Rev.*, 11 OTR 463, 466 (1990). Where the pleadings are unclear, the scope of a taxpayer's adjudicated value appeal may be determined from statements made at trial. *See*, *e.g.*, *Gettman v. Dept. of Rev.*, TC 3388, WL 300719, at *1 (Or Tax Aug 5, 1993).

Here, based on statements made at the beginning of trial by both parties, the court finds that Plaintiff appealed only Defendant's adjustments under ORS 309.115 and that Defendant understood that to be the scope of Plaintiff's appeal. Accordingly, only the adjustments are at issue; the court will not make a new determination of the subject property's value independent of its adjudicated value.

B.      *2015–16 Tax Year*

Plaintiff faces an obstacle to her appeal of the 2015–16 year—the final year in which value for the pole barn was added—because she did not timely appeal to BOPTA. Generally, appeals of valuation questions must be brought to BOPTA before they come to this court. *See* ORS 305.275(3); *Gray v. Multnomah County Assessor*, TC 4810, WL 933072 (Or Tax Apr 8, 2008).

/ / /

Two exceptions to that general rule are found in ORS 305.288. ORS 305.288(1) requires this court to correct errors in the real market value of certain dwellings where "it is asserted in the request and determined by the tax court" that the difference between the correct real market value and the tax roll real market value is at least 20 percent of the tax roll value. This court is also permitted to correct errors by ORS 305.288(3) where "good and sufficient cause exists for the failure by the assessor or taxpayer to pursue the statutory right of appeal."

Here, Plaintiff did not allege good and sufficient cause for failing to appeal her 2015–16 assessment to BOPTA. To obtain relief, then, she must assert a 20-percent error in the subject property's real market value, and the court must determine there is such an error. ORS 305.288(1).

Plaintiff did assert a 20-percent error in her Complaint, and for that reason the 2015–16 tax year was not dismissed at an earlier stage of this case. However, at trial Plaintiff increased her requested 2015–16 tax roll real market value because trending would build off the subject property's 2014–15 tax roll value following the dismissal of that year from this appeal. Plaintiff's revised request was that the 2015–16 real market value be reduced from $226,720 to $209,561, a difference of less than eight percent.

The text of ORS 305.288(1) requires that a 20-percent error be "asserted" by the taxpayer. Because Plaintiff's final request did not assert a 20-percent error on the 2015–16 tax roll, her appeal of that year must be denied.[7]

/ / /

---

[7] Gray's method of valuing the pole barn was deeply flawed, regardless. Gray did not demonstrate why the work of a licensed contractor should receive a 30-percent discount for "amateur workmanship" simply because he owned the property. Nor was Gray's 48-percent reduction for lack of water on the property adequately supported. A reduction in value by BOPTA is not conclusive; the adjustment must be supported by market evidence. Gray's pairing of the sales of a mobile home and a stick-built house are not persuasive because the evidence did not show the two properties were alike in all relevant respects other than access to water.

B.      *2016–17 Tax Year*

The value added by Defendant for 2016–17 was entirely due to its 15 percent trend. Plaintiff asserts that the correct trend is 1.3 percent. Plaintiff, as the party seeking affirmative relief, must bear the burden of proof by a preponderance of the evidence. *See* ORS 305.427. That means she must show that "the facts asserted are more probably true than false." *Cook v. Michael*, 214 Or 513, 527, 330 P2d 1026 (1958).

Assessors are responsible for valuing all taxable property at 100 percent of its real market value each year. ORS 308.232. Physically appraising every property is not possible, so properties not physically appraised in a given year are "subject to trending or indexing." *Cf.* ORS 308.233(2). Trending and indexing are developed from annual "ratio studies" prepared by the county assessors. *See* OAR 150-308-0310(4); ORS 309.200.

A ratio study compares the total real market value of the prior year with the total real market value of the current year among properties of like "class" and within a common "market area." OAR 150-309-0230(12). "Class" in this context is property class, which is distinct from the quality class found in appraisals of improvements. OAR 150-309-0230(6); OAR 150-308-0310(7). Components of a property's class include its highest and best use, its zoning, and additional factors, such as whether the property is improved and whether it has a manufactured structure. OAR 150-308-0310(8). A "market area" is "a group of properties that generally shares important characteristics that influence value." OAR 150-309-0230(2). "Each market area should contain a sufficient number of accounts to ensure an adequate sale sample for analysis." *Id.* Once the ratio applicable to a given property class and market area is developed, the adjudicated value of a property within that class and market area may be calculated by applying the ratio to the prior year's adjudicated value. OAR 150-309-0210(5).

The court has authority to evaluate a county's ratio study and redetermine the trend applied to property on the basis of the evidence. *See*, *e.g.*, *Niemeyer v. Dept. of Rev.*, 14 OTR 34, 38–39 (1996).

In this case, Plaintiff's evidence of her preferred trend is unreliable because Gray's sample size is insufficient and the trend was derived from sales of a property outside the subject property's class. Gray's sample size was one property: the Edgemont Drive property. With only one property, it is impossible to tell whether that property's value change was an outlier as compared to other properties of its class; the margin of error is indeterminate. Furthermore, the Edgemont Drive property was a manufactured structure and therefore of a different property class than the subject property. *See* OAR 150-308-0310(8). Distinguishing the property class of a manufactured structure is reasonable in light of trial testimony about the difficulty in obtaining financing for such buildings as compared to stick-built homes. A trend derived from the market activity of a manufactured structure cannot be applied to the subject property under the regulations implementing ORS 309.115. *See* OAR 150-309-0210(4) (trending applied to adjudicated values must be that applied to "properties in the same property class"). The court cannot give any weight to the trend calculated by Gray.

The court does have authority to determine the correct value of the subject property regardless of the values pleaded by the parties. ORS 305.412. However, the court must have evidence on which to base such a determination. *See id*.

Here, there is little evidence of trending beyond Gray's calculation based on Edgemont Drive. Neither party provided Defendant's ratio study to the court. While Defendant did not establish that its trending was correct, the burden of proving a change to the tax roll falls on

/ / /

Plaintiff. *See* ORS 305.427. Without reliable evidence from either side on which to base a correction of the tax roll, the court cannot order such a correction.

III. CONCLUSION

The court concludes that Plaintiff did not meet the requirements of ORS 305.288(1) to claim relief for 2015–16 and did not bear her burden of proof with respect to 2016–17. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ___ day of January, 2018.

POUL F. LUNDGREN
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Poul F. Lundgren and entered on January 9, 2018.*