300 April 18, 2019 No. 14

IN THE OREGON TAX COURT
REGULAR DIVISION

AKS LLC,
an Oregon limited liability company,
and Herman RV Storage LLC,
an Oregon limited liability company,
*Plaintiffs*,

*v.*

DEPARTMENT OF REVENUE,
State of Oregon, and
Washington County Assessor,
*Defendants*.

(TC 5308 & TC 5309)

In these consolidated cases, the taxpayers appealed the assessor's revaluation of their building after it was subdivided into condominiums. The subdivision was an "exception" event under Measure 50 that allowed a new maximum assessed value to be determined based on the real market value (RMV), and for the year of the subdivision the RMV was subject to the "adjudicated value" restriction in ORS 309.115. In TC 5308, the court held that the fact that a dispute about RMV also involves an "adjudicated" value does not change the procedural requirement to appeal first to the county Board of Property Tax Appeals (BOPTA) before seeking review by the Magistrate Division. In TC 5309, the court denied the Department of Revenue's motion for summary judgment on the substantive issue determining that a material issue of fact existed as to whether the assessor correctly determined the RMV. The court concluded that, when a property with an "adjudicated" value is subdivided, the RMV of the Subject Property is the sum of (a) the previously adjudicated value determined under ORS 309.115; (b) any positive or negative change in previously adjudicated RMV for reasons 'directly related' to the subdivision (*i.e.*, changes reasonably related to the subdivision without any intervening space or time); and (c) the positive or negative effect of any other adjustments allowed by ORS 309.115(2).

Oral argument on Defendant's Motion for Summary Judgment was held May 22, 2018.

Michael J. Mangan, Tonkon Torp, LLP, Portland, filed a response and argued the cause for Plaintiffs.

Daniel Paul, Assistant Attorney General, Department of Justice, Salem, filed the motion and argued the cause for Defendant Department of Revenue.

Decision rendered April 18, 2019

## ROBERT T. MANICKE, Judge.

## I.   INTRODUCTION

Plaintiffs (taxpayers), whose property became a multi-unit condominium in 2015, claim that Defendant-Intervenor Washington County Assessor (the assessor) impermissibly increased the property's real market value (RMV) for tax year 2016-17. They argue that the "adjudicated value statute," ORS 309.115,[1] prohibited the RMV increase. Although under Measure 50 and its implementing statutes,[2] property no longer is taxed automatically at RMV, RMV remains important because it is one of two components in calculating the "maximum assessed value" (MAV) of property that has been affected by certain "exception" events, including, for purposes of this case, submission to the condominium form of ownership.[3] MAV, as the name implies, sets an upper limit on the taxable value of property (the "assessed value" or AV). Thus, for the year after an exception event, a reduction in RMV can reduce MAV, which in turn reduces the amount of tax due. The same initial reduction in RMV after an exception event also can reduce tax over the long term because, once set, MAV generally cannot increase by more than three percent annually. In this case, taxpayers claim the assessor lacked any legal or factual basis to change the RMV from the previously adjudicated value, and they therefore also contest the resulting MAV and AV.

Uncertain how to appeal, taxpayers simultaneously followed two different routes, resulting in two cases, which the court has consolidated. Defendant Department

---

[1] Unless otherwise noted, the court's references to the Oregon Revised Statutes (ORS) are to the 2015 edition.

[2] "Measure 50" is the common name for Article XI, section 11, of the Oregon Constitution. The principal implementing statute involved in this case is ORS 308.156. The principles and terms used in this overview paragraph are discussed in greater detail below.

[3] The other component is the "changed property ratio" (CPR), a percentage that is often well below 100 percent. As relevant in this case, ORS 308.156(5) prescribes the following formula:

$$MAV = RMV \text{ of affected property} \times CPR$$

of Revenue (the department)[4] asks the court to dismiss Case No. TC 5308 on procedural grounds and seeks summary judgment upholding all of the assessor's values in Case No. TC 5309, relying on the assessor's authority to make "adjustments" to adjudicated value in the case of "[c]hanges directly related to subdividing or partitioning the property," pursuant to ORS 309.115(2)(f). The court will address both the procedural route of appeal and the merits of the parties' arguments based on the adjudicated value statute.

## II.   FACTS

The parties agree on the following facts:

(1)  "In the 2014-15 tax year, the [Subject Property] was identified in the Washington County tax records as account number R529930. The plaintiff appealed the 2014-15 real market value of the [Subject Property] in TC-MD 150181C, resulting in a July 24, 2015 stipulated judgment adjudging that the [RMV] of account number R529930 was $3,300,000 for the 2014-15 tax year. The assessed value of the [Subject Property] was reduced to $3,300,000."

(2)  "On January 9, 2015, the property owner filed a declaration of condominium ownership, subdividing[5] the [Subject Property] into nine primary units in one concrete tilt-up building and 97 parking units. Per the agreement, each unit is considered a parcel of real property subject to separate assessment and taxation."

(3)  "For the 2016-17 tax year, the Washington County Assessor assigned individual property tax accounts to each of the 106 units created by the January 9, 2015

---

[4] Defendant-Intervenor Washington County Assessor did not move for summary judgment or join in the department's motion.

[5] The parties at various points use the terms "subdivision" and "partition" when referring to the legal consequence of the declaration of condominium ownership, and they agree that any distinction is not relevant for purposes of this case. A condominium developer generally is required to comply with Oregon's Subdivision and Series Partition Control Law, ORS 92.305 to 92.495, as if the developer were subdividing land. *See* ORS 100.115(1) (requiring filing of a plat complying with various provisions of ORS chapter 92); 1 Oregon Real Estate Deskbook § 36.3-4 (OSB Legal Pubs 2015); 37 Or Op Atty Gen 1045 (1976). ORS 92.010(9) excludes from the definition of "partitioning land" a division "as a result of the recording of a *** condominium plat ***." On the other hand, ORS 92.010(16) contains no such exclusion from the definition of "subdivide land." Accordingly, the court generally refers to the event in this case as a subdivision.

condominium subdivision. All land not assigned to one of the new accounts was retained in account number R529930. The Washington County Assessor individually valued each of the 107 tax accounts (the 106 created by the subdivision and the altered R529930) for the 2016-17 tax year, and assigned a RMV and a [MAV] to each of the 107 accounts. The total RMV placed on the tax rolls by the Assessor of the 107 accounts was $4,904,540; the total MAV placed on the tax rolls by the Assessor was $3,562,820."

Taxpayers appealed the assessor's actions for 2016-17, claiming that the "Adjudicated Value of the subject property should not exceed $3,300,000 pursuant to ORS 309.115 ***." Taxpayers also claim that the assessor erred because "the maximum assessed value of all accounts cannot exceed the total maximum assessed value of the affected property pursuant to ORS 308.162." Taxpayers do not, however, allege a specific dollar amount for the correct total MAV of the Subject Property.

Taxpayers pursued two appeal routes simultaneously, as described below.

A.  *Direct Appeal to Magistrate Division, TC-MD 170007R (TC 5308)*

In TC 5308 (formerly TC-MD 170007R), taxpayers appealed directly to the Magistrate Division, asking the court to reduce the RMV and AV of the Subject Property to no more than $3,300,000. The assessor, defendant in the Magistrate Division proceedings,[6] moved to dismiss taxpayers' complaint for failure to first appeal to the Washington County Board of Property Tax Appeals (the BOPTA). The magistrate held that the BOPTA has authority to hear the issues presented by taxpayers, and therefore taxpayers were required to obtain an appealable order from the BOPTA before instituting proceedings in the Tax Court. Accordingly, the magistrate dismissed taxpayers' complaint. Taxpayers then appealed to the Regular Division.

---

[6] *See* ORS 305.560(1)(c)(A) (county assessor is initial defendant in property tax valuation cases); ORS 305.501(5)(c) (department becomes defendant in Regular Division).

B.  *Appeal to BOPTA, Then to Magistrate Division, TC-MD 170202R (TC 5309)*

In TC 5309 (formerly TC-MD 170202R), taxpayers appealed first to the BOPTA, which convened hearings on all 107 petitions and sustained the assessor's assessment values. Taxpayers appealed to the Magistrate Division from those orders.[7] On September 5, 2017, the Regular Division on its own motion specially designated TC 5309 for hearing in the Regular Division. *AKS, LLC v. Dept. of Rev.*, TC 5309 (Or Tax, Sept 5, 2017).

C.  *Consolidation of Cases TC 5308 and TC 5309*

On October 5, 2017, the department moved to dismiss TC 5308, reiterating the assessor's argument in the Magistrate Division that taxpayers should have first appealed to the BOPTA. On November 21, 2017, the Regular Division denied the department's motion but granted a motion by taxpayers to consolidate the two cases for further proceedings on both the merits and the procedural issue. *AKS LLC v. Dept. of Rev.*, TC 5309 (Or Tax, Nov 21, 2017).

The department now seeks summary judgment, arguing that the assessor correctly followed the applicable statutes in its assessment of the Subject Property and in the alternative seeking summary judgment as to TC 5308, once again on the grounds that taxpayers failed to exhaust their administrative remedies before the BOPTA in that case.

## III.  ISSUES

(1)  Whether taxpayers properly brought their claims regarding the application of ORS 309.115(2)(f) directly in the Magistrate Division, or whether taxpayers were required to first bring those claims before the BOPTA.

(2)  Whether the assessor correctly set the RMVs and AVs for all of the tax accounts existing immediately after the Subject Property became a multi-unit condominium.

---

[7] Then-Defendant Washington County Assessor challenged the timeliness of the appeal to the Magistrate Division in a motion to dismiss. The magistrate denied the motion. *AKS LLC v. Washington County Assessor*, TC-MD 170202R (Or Tax M Div, July 28, 2017). In the Regular Division, neither the department nor Defendant-Intervenor contests the timeliness of the appeal.

## IV.   ANALYSIS

A.  *Procedure to Appeal Assessor's Actions Under ORS 309.115*

ORS 309.100 provides a specific appeal route for certain property tax matters. The statute allows a property taxpayer to appeal to the BOPTA regarding a matter within the BOPTA's authority as prescribed in ORS 309.026. ORS 309.100(1). ORS 309.110(7) allows a taxpayer dissatisfied with a BOPTA order to appeal to the Magistrate Division.

By contrast, ORS 305.275 allows a direct appeal to the Magistrate Division in a wide range of circumstances, including matters involving taxes other than property tax and appeals brought by persons other than taxpayers. *See* ORS 305.275(1)(a) (allowing "any person" to appeal if aggrieved by certain acts or omissions not only of county officials, but also the department in its administration of "the revenue and tax laws of this state"). However, ORS 305.275(3) provides: "If a taxpayer may appeal to the [BOPTA] under [ORS] 309.100, then no appeal may be allowed [in the Tax Court]." ORS 305.275(3). Therefore, if taxpayers could have brought their claim before the BOPTA, the court must dismiss their appeal in TC 5308 for failure to do so.

ORS 309.026 provides that the BOPTA "shall hear petitions for the reduction of *** the assessed value *** or *** real market value of property ***." ORS 309.026(2)(a), (b). Taxpayers ask the court to determine "that the real market and assessed values of the subject property for the 2016-17 tax year is [*sic*] no more than $3,300,000." Nevertheless, taxpayers argue the BOPTA does not have jurisdiction over their claims because ORS 309.115(1) sets an "adjudicated value," and ORS 309.026 does not specifically authorize a BOPTA to determine whether an assessor has complied with the requirement to set, retain, or adjust an adjudicated value. Therefore, taxpayers argue, they must appeal directly to the Magistrate Division under ORS 305.275.

The court does not accept taxpayers' argument. First, unlike "real market value," "assessed value," and "maximum assessed value," the term "adjudicated value" appears nowhere in Oregon's property tax statutes. Rather,

the statute commonly referred to as the "adjudicated value statute," ORS 309.115, provides for the setting of *real market value* in particular circumstances, subject to adjustments.[8] The BOPTA's enabling statute expressly authorizes it to reduce real market value, and nothing limits the facts or circumstances the BOPTA may consider in deciding whether to do so. ORS 309.026(2)(b).

At oral argument, taxpayers' counsel stated that taxpayers are concerned in part that a line of cases addressing appeals under ORS 309.115 might be interpreted to mean that the BOPTA's authority to reduce a property's RMV does not extend to the reduction of an adjustment to a previously adjudicated RMV. *See Pacificorp v. Dept. of Rev.*, 11 OTR 463 (1990); *Niemeyer v. Dept. of Rev.*, 14 OTR 34 (1996). However, the court finds nothing in those cases that purports to limit the BOPTA's authority to determine whether the assessor has correctly applied ORS 309.115. Those opinions simply clarify that a taxpayer whose property is the subject of a prior adjudication may, within the five-year period, choose whether to (a) retain the baseline adjudicated value and merely challenge the accuracy of any adjustments the assessor makes under ORS 309.115(2); or (b) forgo the protection of the adjudicated value, and put the RMV of the property generally at issue in the hope of obtaining a new reduction. If the taxpayer chooses the second alternative, the taxpayer takes the risk that the court might determine that, not only is no reduction justified, but in fact the RMV is higher than the prior adjudicated value. *See* ORS 305.412 (Tax Court can determine the "correct" valuation on the basis of the evidence, regardless of the values pled); *Gettman v. Dept. of Rev.*, TC 3388, WL 300719 (Or Tax, Aug 5, 1993) ("[P]laintiffs are not appealing the assessor's application of ORS 309.115. Rather, plaintiffs are appealing the real market value of the property. Hence, the decision of the court

---

[8] ORS 309.115(1) provides that, following an order of this court or a BOPTA, "the value so entered *shall be* the *real market value* entered on the assessment and tax rolls for the five assessment years next following the year for which the order is entered." ORS 309.115(1) (emphases added). The next subsection provides exceptions to the general freezing of the value, including for trending, additions to the property, and as discussed below, changes "directly related to subdividing or partitioning the property." ORS 309.115(2). However, the statute refers to all of these exceptions as "adjustments *** to the real market value ***." *Id.*

in this case is a new determination which may be higher or lower than the value claimed by either party. *See* ORS 305.435.").[9] In this case, taxpayers have made clear that they have selected the first alternative and not the second; they rely on the RMV of the Subject Property as adjudicated for the 2014-15 tax year and contest the assessor's change to the RMV under the exception in ORS 309.115(2)(f). Taxpayers were required to appeal to the BOPTA before seeking review in the court, which is what they did in TC 5309. The court grants the department's motion as to TC 5308; however, pursuant to the court's prior order of consolidation, the court will hold TC 5308 in abeyance, and will not issue a judgment, pending this court's resolution of TC 5309.

B.   *Assessor's Determination of RMV and AV Pursuant to ORS 309.115(2)(f).*

The court next considers whether the assessor correctly determined the RMV and AV of the Subject Property. The department's motion asserts that the assessor's determinations must stand as a matter of law because taxpayers' legal theory of the computation of RMV, MAV, and AV following a subdivision is incorrect, and because taxpayers have offered no alternative values specific to the post-subdivision property. The department argues that all property "affected" by a subdivision or partition, within the meaning of ORS 308.156(5),[10] necessarily undergoes a "change" in value that

---

[9]   In *Niemeyer*, the court noted that the taxpayer had sent the court a letter "inform[ing] the court that he elected to *appeal the adjudicated value under ORS 309.115 rather than the real market value under ORS 308.205*." 14 OTR at 35 n 1 (emphasis added). The footnote should not be read as precluding BOPTA review of adjustments to adjudicated value under ORS 309.115.

[10]   ORS 308.156 provides, in relevant part:

"(1) If property is subdivided or partitioned after January 1 of the preceding assessment year and on or before January 1 of the current assessment year, then the property's maximum assessed value shall be established as provided under this section.

"* * * * *

"(5) The property's maximum assessed value shall be the sum of:

"(a) The maximum assessed value determined under ORS 308.146 that is allocable to that portion of the property not affected by an event described in subsection (1), (2), (3) or (4)(a) of this section; and

"(b) The product of the real market value of that portion of the property that is affected by an event described in subsection (1), (2), (3) or (4)(a) of this

is "directly related" to the subdivision, within the meaning of ORS 309.115(2)(f). ("The new value, which accounts for the partition/subdivision of the property, reflects the change in value directly related to the partition/subdivision.") ("The protection of ORS 309.115 was lost when the property was subdivided, pursuant to ORS 309.115(2)(f).") The department quotes portions of the legislative history as evidence that the legislature intended this result in order to close a "loophole" between the interplay of Measure 50 and the adjudicated value statute.

Taxpayers do not dispute that the Oregon Condominium Act required the assessor to treat each condominium unit created by the 2015 declaration as a "parcel *** subject to separate assessment and taxation." ORS 100.555(1)(a). Nor do taxpayers dispute that the declaration required the assessor to compute a new MAV for each post-subdivision condominium unit. Taxpayers claim, however, that for purposes of calculating that new MAV, the RMV set for the 2014-15 tax year functions as a cap on the aggregate RMV of all of the condominium units, except to the extent of any "adjustment" allowed for "changes" in RMV that are "directly related" to the subdivision pursuant to ORS 309.115(2)(f). Taxpayers argue that the court cannot grant the department's motion for summary judgment because there is an outstanding issue of material fact, namely whether any difference in RMV as of January 1, 2016, was "directly related" to the act of subdividing the Subject Property. In support, taxpayers' counsel submitted a declaration to the effect that taxpayers have retained an expert prepared to testify that the subdivision has not increased the value of the Subject Property. *See* Tax Court Rule (TCR) 47 E.

---

section multiplied by the ratio, not greater than 1.00, of the average maximum assessed value over the average real market value for the assessment year in the same area and property class.

"(6) The property's assessed value for the year shall equal the lesser of:

"(a) The property's maximum assessed value; or

"(b) The property's real market value.

"(7) The Department of Revenue shall provide by rule the method by which the allocations described in subsection (5) of this section are to be made."

When analyzing the meaning of a statutory term, the court begins with the text because "there is no more persuasive evidence of the intent of the legislature than the words by which the legislature undertook to give expression to its wishes." *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009) (internal quotes omitted). However, the court also considers the statutory context. *Id*. The court considers the relevant legislative history "even if the court does not perceive an ambiguity in the statute's text, where that legislative history appears useful to the court's analysis." *Id*. at 172.[11] Finally, if the legislature's intent remains unclear after examining text, context, and legislative history, the court may resort to general maxims of statutory construction to aid in resolving the remaining uncertainty. *Id*.

1.   *Text analysis*

The term "directly related" is not defined by statute, and no court has interpreted it for purposes of ORS 309.115. However, the Supreme Court[12] in *Willamette Egg Farms, Inc. v. Dept. of Rev.*, 331 Or 327, 14 P3d 609 (2000), interpreted the same phrase, as used in a statute exempting "[e]quipment used for the fresh shell egg industry that is *directly related* and reasonably necessary to produce, prepare, package and ship fresh shell eggs from the place of origin to market * * *." *Id*. at 332 (quoting ORS 307.400(5)(e) (1995) (emphasis in original)).[13] The property at issue was equipment used to raise chicks that ultimately would mature into egg-laying hens. *Id*. at 329. The court determined that the term consisted of words of common usage and thus looked to dictionary definitions to establish their plain meaning. *Id*. at 332. The court concluded that "directly" means "'without any intervening space or time,'" and "related" means "'connected by reason of an established or discoverable relation.'" *Id.* (quoting *Webster's Third New Int'l Dictionary*, 641, 1916 (unabridged ed 1993)). Accordingly, the court defined

---

[11] Citing *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), and apparently overlooking that opinion's modification by *Gaines*, taxpayers' argument largely ignores legislative history.

[12] Taxpayers cite only the Tax Court opinion in this case, 14 OTR 337 (1998), without mentioning that the Supreme Court affirmed it in a reasoned opinion.

[13] This statutory exemption now resides in ORS 307.397 (2017).

the term "directly related" to mean reasonably connected without any intervening space or time. *Id.* After considering additional context, the court determined that the legislature inserted the term in order to limit the scope of the exemption, ultimately concluding that property used on chicks was too attenuated from egg production to qualify. *Id.*

As in the case of the egg production statute, there is no indication in ORS 309.115 that the legislature intended "directly related" to have a specialized meaning, nor has either party asserted that it does. Accordingly, the court adopts the plain meaning determined by the Supreme Court in *Willamette Egg Farms*.[14] *Cf. Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 295-96, 337 P3d 768 (2014) (agreeing with parties that phrase at issue was a technical term). Applying the court's definition to ORS 309.115(2)(f), the court concludes that an assessor may "adjust" a previously adjudicated RMV for changes reasonably related to the subdivision without any intervening space or time. To better understand how the term should be applied, the court turns to the context.

2.  *Context*

The court first considers other relevant text within ORS 309.115:

"Effect of real market value correction upon appeal; exceptions.

"(1)  If the Department of Revenue, the board of property tax appeals or the tax court or other court enters an order correcting the real market value of a separate assessment of property and there is no further appeal from that order, except as provided under subsection (2) or (3) of this section, the value so entered shall be the real market value entered on the assessment and tax rolls for the five assessment years next following the year for which the order is entered.

"(2)  Notwithstanding subsection (1) of this section, the following adjustments may be made to the real market value during the period described in subsection (1) of this section:

---

[14] *Webster's* today uses the same phrases quoted in *Willamette Egg Farms*. https://www.merriam-webster.com/dictionary (accessed Apr 11, 2019).

"(a) Annual trending or indexing applied to all properties of the same property class in the county, or within clearly defined areas of the county under this chapter.

"(b) Annual trending or depreciation factors applied to similar property.

"(c) Additions or retirements based upon returns filed under ORS 308.290.

"(d) Additions, retirements or economic trending from the annual valuations under ORS 308.505 to 308.681.

"(e) Increases directly related to additions, remodeling or rehabilitation made to property.

"(f) Changes directly related to subdividing or partitioning the property.

"(g) Changes directly related to rezoning the property and using the property consistent with the rezoning.

"(h) Property damaged, destroyed or otherwise subject to loss of real market value."

The first two adjustments in subsection (2) relate to "trending," which has been described generally as "applying an inflation factor based on sales of similar property in the same area." 39 Or Op Atty Gen 150 (1978) ("Twentieth Question"). The use of trending is not limited to properties with an adjudicated value; rather, it is an integral part of the annual process of recording the RMV of each parcel on the assessment roll, along with numerous other data points about the property. *See* ORS 308.215(1)(a). Recognizing that an assessor may not be able to physically inspect every property every year on the assessment date of January 1, the legislature has allowed an assessor to use trending to capture the periodic appreciation of property, subject to the legislature's express intention that trending should result in "equality and uniformity" as between properties that are physically appraised and those that are not. ORS 308.233(2). Additional laws provide direction for the development of data used for trending.[15] The remaining

[15] *See* ORS 309.200; ORS 309.203; *see also* OAR 150-309-0230 - 150-309-0250 (defining and explaining "ratio studies" of actual sales in the area from one

relevant[16] adjustments are for additions and losses of property (paragraphs (d) and (h), respectively), and for changes directly related to subdividing or partitioning the property (paragraph (f)) or rezoning the property and using it consistently with the rezoning (paragraph (g)).

From this context, the court readily concludes that the legislature intended ORS 309.115 to prohibit an assessor from making an entirely new determination of the value of property previously adjudicated and corrected. Each adjustment allows the assessor to lift the five-year "freeze" on the adjudicated value in subsection (1) to accommodate a specific set of circumstances but otherwise preserves the adjudicated value. In this context, the court concludes that the legislature used the phrase "directly related" to emphasize the limited nature of a permissible adjustment to the value previously adjudicated.

Measure 50, its implementing statutes, and the department's corresponding administrative rules, all of which were adopted within four years before ORS 309.115 (2)(f), supply additional context. The court discusses that context below, in the course of reviewing the relevant legislative history of ORS 309.115.

### 3.  *Legislative history*

The court considers two sources of legislative history regarding ORS 309.115. First are the proceedings originally enacting ORS 309.115, which the legislature passed as House Bill (HB) 2297 (1989). Or Laws 1989, ch 678, § 2 (HB 2977). The second set of proceedings relates to the amendment by HB 2205 (2001), which added ORS 309.115 (2)(f) in response to Measure 50. Or Laws 2001, ch 6, § 1 (HB 2205).

---

year to the next); OAR 150-309-0210(2) (requiring use of ratio studies in applying trending to properties subject to adjudicated value). In *Niemeyer*, the taxpayer challenged the validity of the assessor's ratio study as applied to the trend factor the assessor used to determine an adjustment to his property under the adjudicated value statute. 14 OTR at 36-38.

[16] The adjustments in paragraphs (c) and (d) apply only to business personal property or centrally assessed property, respectively, and do not apply to the Subject Property, which is locally assessed real property.

a. Original enactment of ORS 309.115: HB 2977 (1989)

The legislative history of the bill first enacting ORS 309.115 makes clear that the purpose was to prevent assessors from reacting to taxpayer valuation appeals in an overly aggressive manner. Legislators recounted repeated complaints from constituents, over a number of legislative sessions, about assessors who assigned an excessive value to property for a particular tax year, then, after the taxpayer appealed and the local tribunal or this court ordered the value to be reduced for that year, assigned the same excessive value (or an even higher value) to the property for the subsequent year. *See* Tape Recording, House Committee on Revenue and School Finance, HB 2977, May 2, 1989, Tape 118A (statements of Chair Carl Hosticka and Rep Kevin Mannix). Legislators heard testimony from the department acknowledging that the problem, though not widespread, likely existed. *Id.*, Tape 119 (statements of Department of Revenue Director Jim Kenney). Toward the end of the session, proponents learned that some complaints (including from taxpayers who had testified earlier) were about increases attributable to "trending," which as described above refers to formulaically generated increases in value applied to all property in the same class or area. *Id.* (testimony of Rep Kevin Mannix). The proponents agreed that they did not want to limit an assessor's ability to apply trending, but only an assessor's ability to single out property for revaluation within a five-year period of "repose." *Id.*

As originally enacted in 1989, ORS 309.115 did not address partitions or subdivisions, but it did include the term "directly related" as part of the exception for "[i]ncreases directly related to additions, remodeling or rehabilitation made to locally appraised property." ORS 309.115 (2)(e) (originally codified as ORS 309.115(2)(f) (1989)). The term "directly related" did not appear in the early versions of HB 2977, which simply provided that the new law would not apply to "[a]n assessment year for which improvements are made to the property." HB 2977 (1989) (A-Engrossed). That language was later amended to provide that the new law would not apply to "changes in value as a result of * * *

[i]ncreases in value *due to* additions, remodeling or rehabilitation made to locally appraised property." *See* Exhibit 9, Senate Committee on Revenue and School Finance, HB 2977, June 5, 1989, -A4 (emphasis added). The final form of the bill took shape after Jim Kenney of the department requested the removal of the first of two redundant references to "value" and the insertion of "directly related." Tape Recording, Senate Committee on Revenue and School Finance, HB 2977, June 5, 1989, Tape 180, Side A (statement of Jim Kenney). A representative of Associated Oregon Industries (AOI) testified that he had met with Kenney, the director of the department, and representatives of county assessors, who had agreed to the phrase "directly related" in order to clarify that the act of making improvements should not render property wholly ineligible for the protection of the bill. *Id.*, Tape 179, Side A (statement of Gary Carlson of AOI). Rather, only the improvements would be valued and their value added to the previously adjudicated value. *Id.* The final text, with respect to additions, read:

> "(2)   Subsection (1) of this section shall not apply to changes in value as a result of * * * [i]ncreases directly related to additions, remodeling or rehabilitation made to locally appraised property."

HB 2977 (enrolled).

This legislative history confirms that the legislature originally intended the term "directly related" to require the assessor to limit his or her determination of value to the specific subject of the adjustment, which in 1989 was "improvements."

### b.   Amendment of ORS 309.115: HB 2205 (2001)

In 2001, the legislature enacted HB 2205, creating the exception for "[c]hanges directly related to subdividing or partitioning the property." ORS 309.115(2)(f) (2001); Or Laws 2001, ch 6, § 1. The legislative history makes clear that HB 2205 was enacted in response to the adoption of Measure 50 four years earlier.  Accordingly, the court starts by setting forth relevant aspects of Measure 50.

(1)    Background and effect of Measure 50

The constitutional amendment known as Measure 50 effected a sea change in Oregon property tax law, substantially disconnecting the growth of Oregon property tax revenues from growth in the fair market value of property. The immediate roots of Measure 50 lie in Measure 47, a "short-lived" constitutional amendment adopted by the people via initiative petition in 1996, but found to be technically unworkable. *See Flavorland Foods v. Washington County Assessor*, 334 Or 562, 564, 54 P3d 582 (2002) (quoting *Shilo Inn v. Multnomah County*, 333 Or 101, 107 n 6, 36 P3d 954 (2001), *modified on recons*, 334 Or 11, 45 P3d 107 (2002)). In 1997, the legislature drafted Measure 50 as a replacement and referred it to the people, who adopted it that year. *See id.* The legislature then enacted or modified dozens of statutes to reflect the constitutional change. *See* Or Laws 1997, ch 541. Given its scope, it is not surprising that Measure 50 prompted further correcting and conforming legislation over the course of several legislative sessions. *E.g.,* Or Laws 1999, ch 579, § 4 (amending content of tax roll in ORS 308.215 to remove references to MAV and AV); Or Laws 1999, ch 1003 (allowing changes to MAV when RMV is reduced due to fire or acts of God); Or Laws 2001, ch 509, §§ 9-10 (CPR may not exceed 1.00).

Measure 50 achieved property tax reduction by adopting a "cut and cap" approach. Under the "cut" feature, for property that existed in the 1997-98 property tax year "each unit of property in this state shall have a maximum assessed value for ad valorem property tax purposes that does not exceed the property's real market value for the tax year beginning July 1, 1995, reduced by 10 percent." Or Const, Art XI, § 11(1)(a). For tax years after 1997-98, growth of the MAV is "capped": MAV "shall not increase by more than three percent from the previous tax year." *Id*. § 1(b). For each tax year after 1997-98, the property is taxed at the lesser of (a) its RMV as of the preceding January 1; or (b) its MAV. *Id*. § (1)(f). This "lesser-of" amount is the "assessed value" or AV. *See* ORS 308.146(2).

There are exceptions to the "cap" feature for six kinds of events:

"(a)   The property is new property or new improvements to property;

"(b)   The property is partitioned or subdivided;

"(c)   The property is rezoned and used consistently with the rezoning;

"(d)   The property is first taken into account as omitted property;

"(e)   The property becomes disqualified from exemption, partial exemption or special assessment; or

"(f)   A lot line adjustment is made with respect to the property, except that the total assessed value of all property affected by a lot line adjustment may not exceed the total maximum assessed value of the affected property ∗∗∗."

ORS 308.146(3).[17] If an exception applies, the assessor must set a new MAV. In this case, the parties ask the court to decide how to apply the exception for partition or subdivision when the property is subject to the adjudicated value statute, ORS 309.115. Because the computation of MAV is at the heart of the parties' arguments, the court presents a series of examples.

The court first discusses the conceptually simpler and more frequently used exception for new property, which starts with the RMV of the new property. "New property" is defined as "changes in the value of property as the result of ∗∗∗ [n]ew construction, reconstruction, major additions, remodeling, renovation or rehabilitation of property"; the "addition of ∗∗∗ taxable real or personal property to the property tax account"; and certain other, less common, changes. ORS 308.149(6)(a)(A), (C). *See DISH Network Corp. v. Dept. of Rev.*, 364 Or 254, *passim*, 434 P3d 379 (2019) (discussing numerous aspects of definition). When this exception applies, the new MAV is determined by multiplying the RMV of the new property by "the ratio of average maximum assessed value to average real market value of property

---

[17] *See DISH Network Corp. v. Dept. of Rev.*, 364 Or 254, 269, 434 P3d 379 (2019) (noting that the list of exceptions in ORS 308.146(3) "exactly mirrors Measure 50's list of exceptions"); Or Const, Art XI, § 11(1)(c).

located in the area in which the property is located that is within the same property class." Or Const, Art XI, § 11(1)(c). This ratio is commonly referred to as the "changed property ratio" or "CPR," a percentage that is subject to change each year. For many classes of real property, CPR often is substantially lower than 100 percent,[18] roughly replicating the discount that similar, preexisting property in the area enjoys as a result of application of the "cut and cap" features over time. As the final step, the assessor adds the MAV of the preexisting property to the MAV of the new property to arrive at the total MAV for the parcel. *See* ORS 308.153(1).

    *Example 1:   New MAV After an Addition; No Adjudication.*   As an example of the exception for new property or new improvements, assume that a property owner builds a new commercial building on a previously undeveloped lot. Before construction, the bare land has an RMV of $130,000 and a MAV of $100,000. As of January 1 after construction, the assessor determines that the RMV of the new building is $500,000; thus the total RMV of the parcel is $630,000 ($130,0000 land + $500,000 improvements). Assume further that the CPR for commercial property in the area is 70 percent. The assessor sets the MAV attributable to the new building at $350,000 ($500,000 × 70%). The assessor must add that MAV amount to the MAV of the existing bare lot; the result is the total MAV of the parcel: $450,000 ($350,000 + $100,000).[19] Because the parcel's MAV is less than its RMV, Measure 50 requires that the *assessed* value of the entire improved parcel, *i.e.*, the value to which the local tax rate actually will be applied, is also set at $450,000, providing in effect a 28.6 percent "discount" compared to the pre-Measure 50 approach of taxing property at

---

   [18] In this case, the department supplied evidence that the assessor applied a CPR of 72.5 percent to the Subject Property for the 2016-17 tax year. *See, e.g.*, *Haynie v. Dept. of Rev.*, 19 OTR 488, 492 (2008) (CPR for residential property in Hood River County was 54.6 percent for the 2006-07 tax year); public records from the Marion County assessor at *https://www.co.marion.or.us/AO/Documents/ReportsAndData/CPR/2001cpr.pdf* (CPRs for the 2001-02 tax year included 81.3 percent for residential property, 70.96 percent for commercial property and 80.7 percent for industrial property); s*ee* OAR 150-308-0310 (defining classes of property and prescribing numeric codes to describe them).

   [19] For simplicity, Examples 1-3 ignore any potential three percent increase in MAV; thus in this Example 1, MAV of the land remains $100,000.

its RMV ($630,000 – $450,000 = $180,000. $180,000/$630,000 = 28.57%).[20]

*Example 2:    Basic MAV Reset after a Subdivision; No Adjudication.*    The court now turns to the exception for property that has been subdivided. As with new property, the assessor must compute a new MAV that is the sum of two components, in this case: (1) the existing MAV of any part of the property not "affected" by the subdivision;[21] plus (2) the RMV of the property affected by the subdivision multiplied by the CPR. ORS 308.156(5).

*2.a.*    For example, using the same assumptions above, the parcel has an RMV of $630,000 and a MAV of $450,000 in the year after the building is constructed ("Year 1"). Now assume that the parcel undergoes subdivision three years later ("Year 4"). As a base case, assume the RMV remains the same and the CPR is still 70 percent. If all portions of the parcel are "affected" by the subdivision, then a new MAV will be calculated for the entire parcel. Not surprisingly, assuming no "natural" appreciation of RMV due to market forces, and also no increase in RMV attributable to the act of subdivision, the new MAV is similar to the MAV set in Year 1: $441,000 ($630,000 × 70%).

*2.b.*    If, however, the RMV in Year 4 were to rise to $850,000, whether due to natural appreciation or because of the act of subdividing the property, the new MAV would be $595,000 ($850,000 × 70%). In other words, a $220,000 increase in RMV by Year 4 would cause a substantial increase in MAV of $154,000. ($850,000 – $630,000 = $220,000. $595,000 – $441,000 = $154,000.)

*2.c.*    As a variation, assume that the RMV of the parcel in Year 4 drops from the base-case value of $630,000 to $525,000 because the building has declined in value due

[20]  This "discount" is slightly less than the 30 percent discount afforded by the 70 percent CPR. That is because a portion of the $180,000 difference consists of the existing $100,000 MAV of the land, which is not eligible to be multiplied by CPR.

[21]  The department has defined "affected" in an administrative rule that the court discusses below. *See* OAR 150-308-0190(2), formerly 150-308.156(5)(A). The rule generally defines all portions of subdivided land, as well as any improvements divided into separate units, as "affected" *per se*.

to depreciation, and any appreciation of the underlying land is not enough to offset the declining value of the building. If no subdivision or other Measure 50 "exception" event occurs, there will be no change in the property's taxable value (AV) because RMV ($525,000) is still greater than MAV ($450,000). AV remains flat at $450,000. However, if the owner subdivides the property following this decline in RMV, and the act of subdividing the property does not change the RMV, the new MAV will drop to $367,500 to reflect the drop in RMV ($525,000 × 70%). In this variation, the subdivision of the property has allowed the owner to take advantage of the decline in RMV due to depreciation because Measure 50 requires a MAV reset, which necessarily requires multiplying the decreased RMV by the CPR. AV has now dropped by $82,500 ($450,000 − $367,500).

   *Example 3: MAV Reset after a Subdivision of Property with Adjudicated RMV.* The final example incorporates the main issue in this case: calculating the new MAV for property that is subdivided but is subject to the RMV protection of ORS 309.115(1). Assume the same base-case facts for Year 1 as in Example 2.a. above (RMV is $630,000 and MAV is $450,000). However, in Year 2, before any subdivision, the taxpayer challenges the RMV, settles the case, and obtains a stipulated judgment from this court that the RMV of the parcel has declined from $630,000 to $430,000. As of Year 2, the MAV remains unchanged at $450,000 because there has been no "exception" under Measure 50 and the adjudicated value statute applies only to RMV, not MAV. The AV for Year 2 must be set at the lower of RMV and MAV: $430,000.

   Now assume that in Year 4 the taxpayer subdivides the property. Assume that the act of subdividing the property causes the actual RMV to increase to $850,000 by Year 4. Absent the adjustment allowed by ORS 309.115(2)(f), the RMV recorded on the tax roll would be required to remain frozen at the adjudicated value of $430,000, and the new MAV would be $301,000 ($430,000 × 70%). In other words, as a result of the "frozen" RMV from two years before, the new MAV in Year 4 would be $294,000 less than if the RMV had not been frozen ($595,000 from Example 2.b. − $301,000).

The new MAV also would be $149,000 less than the *old* MAV before subdivision ($450,000 from Example 1 – $301,000) because the frozen RMV would have to be multiplied by the CPR. As in Example 2, the subdivision of the property would allow the owner to reduce the property's MAV by applying the CPR to a relatively low RMV, but this time the reason the RMV is low is that it has been "frozen" by the adjudication in Year 2.

As posited in Example 3, the court understands taxpayers to be claiming that, as a matter of law, the assessor must use the "frozen" RMV that was adjudicated for tax year 2014-15 as the starting point for determining the new MAV for 2016-17. Taxpayers tacitly acknowledge that the assessor could "adjust" the adjudicated RMV for any change attributable to the act of subdividing the property, but taxpayers claim they can prove as a matter of fact that there was no such change.[22] If taxpayers can succeed with this claim, then the fact that they would then end up with a MAV that is less than their adjudicated RMV is simply a function of the Measure 50 formula, which requires multiplying RMV by CPR, as illustrated in Example 2.c.

### (2)   Legislative hearings on HB 2205

With the foregoing examples in mind, the court considers the discussions in the legislative committees that heard HB 2205 in 2001. The department formally requested the bill and apparently was involved in its drafting.[23] The bill was "presession filed," meaning that the department filed it with the Office of Legislative Counsel weeks, if not months, before the session began on January 7, 2001.[24] It was introduced and passed early in

---

[22] Neither party discusses the possible effect of trending or other adjustments allowed by ORS 309.115(2).

[23] *See* HB 2205 (2001) at 1 ("Presession filed (at the request of Governor John A. Kitzhaber, M.D., for Department of Revenue)."); *see generally* ORS 171.127(1) (requiring that a bill list the name of any agency making a "formal request" for its introduction; defining "formal request" as "presentation, submission or providing of a drafted measure").

[24] *See* Oregon State Archives, *Oregon Legislators and Staff Guide 2001*, https://sos.oregon.gov/archives/Documents/records/legislative/statehood/2001-regular-session-legislators.pdf (accessed Apr 11, 2019) (2001 regular session began January 8, 2001); *Legislative Style Manual* at 92 (identifying statutory

the session with only one substantive committee hearing in each chamber, each lasting about 25 minutes, and on each occasion the same representative of the department provided the sole testimony and answered committee members' questions.[25] No one in the legislature proposed any amendments. HB 2205 passed both committees unanimously and passed both chambers of the legislature with only one opposing vote, in the House. *Journal of the House of Representatives*, 72nd Legislative Assembly - 2001 Regular Session, H-43. The court's transcriptions of the hearings are set forth in full at Appendix 1 and 2. *See* Tape Recording, House Committee on School Funding and Tax Fairness/ Revenue (HB 2205), Jan 19, 2001, Tape 16, Side A ("House Hearing"); Tape Recording, Senate Committee on Revenue (HB 2205), Feb 7, 2001, Tape 34, Side B ("Senate Hearing").

From the legislative record, it is clear to the court that the committee members had two general intentions in approving HB 2205. First, they intended to alter the adjudicated value statute's "freeze" on RMV in the case of properties that had undergone a subdivision or partition, or rezoning, in order to promote long-term "equity in taxation" between those properties that had benefited from an adjudication and those that had not. Second, in doing so, the committee members intended to preserve the benefit of the "freeze" to the extent the new value was not attributable to the subdivision, partition, or rezoning. In forming these intentions, the committee members made a key factual assumption: that the act of subdividing, partitioning, or rezoning the property would cause the property's value to increase.

### (3)   Promoting "equity in taxation"

The first intention was to promote "equity" or parity between properties whose values had been redetermined by adjudication before undergoing a partition, subdivision or rezoning, and properties that did not have a prior adjudication. The department's representative, John Phillips, first

---

requirements in ORS 171.130 and ORS 171.133 for presession filing of measures); ORS 171.130 (generally requiring filing on or before December 15 of year preceding regular session).

[25]  *See Journal of the House of Representatives*, 72nd Legislative Assembly - 2001 Regular Session, H33-34 (indicating introduction in House of Representatives January 10, 2001, and passage on February 14, 2001).

explained the origin and purpose of the adjudicated value statute as a temporary check against overreach by county assessors who might otherwise compel taxpayers to pursue expensive and unnecessary appeals in successive years. *See* House Hearing ¶¶ 9-13; Senate Hearing ¶¶ 1-2.

The representative, building on data provided by a legislative staff economist in introductory comments, then explained that Measure 50 had reduced the need to protect against an assessor's repeated value increases because Measure 50 established its own new base value that would apply in perpetuity—barring an exception event and ignoring the permissible annual increase of three percent. Moreover, when applied together with Measure 50, the capped value set by the adjudicated value statute created a perpetual gap between adjudicated and nonadjudicated properties, a gap that the assessor could never "recoup."

> John Phillips: "So for example, we use the new construction example. Let's say you have a ten-acre parcel and you didn't appeal your value and you divide it into five two-acre parcels. Under Measure 50, the taxable value for that change is allowed to grow because now you have, maybe, five properties that are maybe buildable now and the value of those individual properties exceeds the total value of the ten-acre parcel. So, under Measure 50, the assessor is allowed to calculate the change in real market value and the corresponding change in taxable value.
>
> "If you take the same property under an adjudicated situation, you would have the ten-acre parcel, they would subdivide it into five two-acre parcels, and the assessor would not be able to make a change in the real market value of that property. Therefore, there would be no change in the taxable value of that property.[26] After the five years

---

[26] This statement is inaccurate. Independent of any amendment to the adjudicated value statute, ORS 308.156 *would* require the taxable (assessed) value to be recalculated because the MAV of all "affected" property would be recalculated. Framed in terms of Example 3 above, the department's testimony incorrectly implies that *MAV* would remain frozen at the "old," pre-subdivision level of $450,000, a result not possible under Measure 50.

Separately, in both the Senate and House committee hearings, the department understated the extent to which property affected by a subdivision is revalued for purposes of the new MAV determination under Measure 50, ignoring any adjudicated RMV. The department's representative stated erroneously that only the *difference* in value after subdivision is multiplied by CPR. *See* Senate Hearing

that property would then come out of adjudication and the assessor would still not be able to make a change in the taxable value and would never be able to make a change. So, two ten-acre parcels side by side and one was adjudicated and one was not, the taxable value of those two properties would be, indefinitely into the future, different.[27] And so, that's why I am characterizing this as an equity in taxation issue."

House Hearing ¶¶ 16-17.

Although the department's description likely understated the issue as noted above, committee members in both chambers quickly used the term "loophole" to describe the long-term benefit that an adjudicated property would receive, based on the department's description.

Rep. Witt: "Follow-up: so the statute as it currently is written relative to adjudicated property apparently has a loophole if you compare it to the Measure 50 standard. Correct?"

Phillips: "Chair Shetterly, Representative Witt, loophole, yes."

Rep. Witt: "Yeah, certainly it is inconsistent when you compare it to the Measure 50 standard."

Phillips: "That's correct."

House Hearing ¶¶ 40-43; *see also* Senate Hearing ¶ 21. Representative Alan Bates proffered a hypothetical to spell out how this "loophole" might work:

---

¶¶ 14-16; House Hearing ¶ 25. In fact, as shown in Example 2 above, ORS 308.156(1) and (5) require that the *entire* new real market value of the affected property be multiplied by CPR. It is unclear whether the committee members internalized this separate error, which tends to understate the increase in assessed (taxable) value that can arise when the MAV of an entire parcel is reset after a subdivision causes a substantial increase in RMV. If the committee members took the department's statements into account, they may have thought that undoing the protection of the adjudicated value statute would have a less significant effect on the assessed value of property that had previously been adjudicated.

Because no committee members specifically commented on this portion of the department's testimony, the court assigns no weight to the foregoing errors.

[27] This statement is largely accurate despite the inaccuracy noted in the preceding footnote. In Example 3, the post-subdivision MAV using "frozen" RMV is $301,000, while the post-partition MAV without a frozen RMV is $595,000. The inaccuracy noted in the prior footnote makes the "delta" between the application of "frozen" and non-frozen RMV seem smaller than it is, but there is such a "delta" in any case.

Rep. Bates:   "*** Let me ask you a question of potentially of something that could happen or maybe has happened. If I have a 100-acre tract and know that I am going to subdivide it in the next year or two, would it be worthwhile for me to ask for—go to court on it, get it adjudicated, then subdivide it, and permanently lower the tax on that?"

Phillips:   "Chair Shetterly, Representative Bates, that would be a strategy that might save you some tax money [laughter], but [I] don't want to get that on the record [laughter]."

Rep. Bates:   "And that's, and what I'm saying is that I'm afraid that could have happened and may be happening and this change would prevent that from happening."

Phillips:   "That's correct."

House Hearing ¶¶ 57-60. The chairman of the House committee, Representative Lane Shetterly, had worked on the drafting of Measure 50 and its implementing legislation four years earlier. He made the following comments at the conclusion of the hearing:

Chair Shetterly:   "I can't believe we overlooked this. [Laughter] *** I tell you, I'm only too glad that this doesn't require a constitutional amendment."

House Hearing ¶ 69. Other legislators remarked on the fact that the adjudicated value statute and Measure 50 were "inconsistent," "not synchronous," even if "not in direct conflict"; that the disparity was "inequitable"; and that "conciliation" of the adjudicated value statute to make it "coincide" with Measure 50 was desirable, as a "housekeeping" matter. House Hearing ¶ 42, Senate Hearing ¶¶ 23, 36, 39, 43, 48. The court interprets these statements as expressions of an intention to change the adjudicated value statute to allow RMV to be reset after a partition, subdivision, or rezoning.

(4)   Preserving some adjudicated value protection

On the other hand, the committee members clearly did not see themselves as abolishing all protection of the adjudicated value statute.[28] The hearings provide ample

_____

[28] At one point, Senator Beyer asked: "John, why not just repeal this thing [*i.e.*, the adjudicated value statute]? Doesn't Measure 50 take care of it?" Senate Hearing ¶ 7. In response, the department's representative confirmed that the

evidence that the committee members intended to avoid "wholesale revaluation" of a parcel after a subdivision or partition. Before the House committee, the department's representative stated:

> Phillips:   "[C]ertain words were chosen for very particular reasons. In the bill itself, it uses the word 'adjustment,' *so it presumes that the part of the property that's not affected should not lose its protection for the adjudicated value. So if only a portion of the property is adjusted due to subdivision, partition or rezoning with consistent use, then that doesn't mean there's a wholesale revaluation of the property—that was our intent, not to do that. And the other words were 'directly affected,' and I think that's on line 19 of the bill, section 1: 'Changes directly related to the subdivision and partition,' so that other changes, not directly related to that, would not change the taxable value for that property.*"

House Hearing ¶ 34 (emphasis added). An exchange in the Senate committee followed similar lines:

> Sen. Witt:   "So this could be viewed as a tax increase bill."
>
> "* * * * *
>
> Sen. George:  "Mr. Chairman, at the bottom of one of our reports, it says: 'This measure will add a minimal amount of additional taxes to the counties' tax rolls annually.' But up above—I'm trying to get a balance on this—it also says the advantage to that taxpayer would be that, if in fact they have an adjudicated value established, that's what it's gonna be. They're protected—well, I'll just read it. It says, 'This protects the taxpayer from unwarranted value increases that must be appealed again, following—.' Apparently, somebody ignored adjudication. So it looks like there's kind of a plus and a minus to taxpayers. It does make it worse, it looks like."
>
> Phillips:  "Chair Ferrioli, Senator George, it does— we tried to draft it so it does retain the protections of the adjudicated value for the property that's unchanged. The issue would be is that if you just changed a small portion of your property then all of the property shouldn't necessarily be changed. You should retain your protection under the

---

bill did not effect a repeal. *Id.* ¶ 8. Chair Ferrioli also declared at the end of the hearing that "a simple repeal of the adjudication process in favor of Measure 50's adjudication process is not warranted * * *." Senate Hearing ¶ 43.

adjudication statute. And in the bill, actually, if I might point out on line 10, the word toward the end of line 10 on page 1 says 'adjustments,' and so *'adjustments' are allowed under this bill, not a wholesale revaluation of the property, but just adjustments.* And then down below on lines 19 and 20, the sections we're adding, the words we're adding use the words 'changes directly related.' So that if you have a large property and you subdivide—or partition I should say—one acre off of it, that all of the buildings don't necessary get revalued. This is just relating to the property that's changed. So, to answer your question, I think it does retain the protections of adjudicated value but it does remove two to make them consistent with Measure 50."

Senate Hearing ¶¶ 30-33 (emphasis added).

The court finds that the department's testimony at times blurs the Measure 50 concept of property "affected" by a subdivision, partition or rezoning with the concept of "directly related" as used in HB 2205. Despite this ambiguity, the court does not attribute to the legislature an intention to allow a "wholesale revaluation" of all property "affected" by subdivision based on the foregoing testimony. Taken as a whole, the court finds that the testimony repeatedly assured legislators that HB 2205 would allow no such thing.[29]

---

[29] The court finds similar ambiguity in the sole relevant portion of the department's written testimony:

"This concept retains the protections of the current statute for the property that was adjudicated. The value of the property adjudicated should remain adjudicated and continue to protect the property owner against further litigation. However, if the property is *changed by* subdivision, partition or rezoning, meeting the consistent use test, in addition to the current new construction and trending exceptions, the *value of the changed property should be an adjustment* to the adjudicated value."

Exhibit 6, House Committee on School Funding and Tax Fairness/Revenue, HB 2205, Jan 19, 2001, 1 (emphases added). This statement can be read to support the department's position in this case that all changes in value, including any appreciation not attributable to the subdivision, must become the new RMV that is then used to calculate the new MAV. However, it is unclear whether the first reference to a "change" is to a change in the nature of the property or to a change in the property's value. If the latter, a taxpayer that can prove that the subdivision did not cause a change in value should retain the full benefit of the adjudicated RMV. If the former, it is difficult to picture how to apply the "value of the changed property" as an "adjustment" to the adjudicated value without creating the "wholesale revaluation" that the department testified was not the intent of the bill.

(5)   Assumption that subdivision enhances value

Virtually all dialogue in the committee hearings assumes that the act of subdividing would enhance the property's value:

John Phillips:   "Let's say you have a ten-acre parcel and you didn't appeal your value and you divide it into five two-acre parcels. Under Measure 50, the taxable value for that change is allowed to grow *because now you have, maybe, five properties that are maybe buildable now and the value of those individual properties exceeds the total value of the ten-acre parcel.* So, under Measure 50, the assessor is allowed to calculate the change in real market value and the corresponding change in taxable value."

House Hearing ¶ 16 (emphasis added).

Phillips:   "Chair Ferrioli, Senator Beyer, what the real crux of the problem is, is that the property that I described, the 10-acre parcel that's then the *value is increased because of the subdivision*, the formula for increasing the taxable value is the increase in real market value multiplied by the changed property ratio, increases the taxable value by that much. On the same property under adjudication, you take the *change in real market value due to the subdivision*, multiplied by the changed property ratio, but the adjudication statute does not allow the real market value to increase, so it's essentially, the formula is zero multiplied by the changed property ratio equals no increase in taxable value. So you've got the two ten-acre parcels, both subdivided, one's adjudicated, one's not. And one has an increase in taxable value, the other doesn't, and then when the five years lapse, they go on, perpetually, at different taxable values."

Senate Hearing ¶ 16 (emphases added). One senator similarly commented:

"Yeah, except as I understand it the Measure 50 exception would be: if you decide to take some action that increases your value, you fall under the exceptions. The fact is that Measure 50 and *** existing statute—maybe they're not in direct conflict, but they're certainly not synchronous."

Senate Hearing ¶ 23.

Chairman Ted Ferrioli stated, as follows, during a portion of the hearing discussing how HB 2205 would interact with recently approved "Measure 7,"[30] dealing with land use issues:

> Sen. Ferrioli: "And certainly rezoning, and use consistent with that rezoning, your *subdivision added value*, or value added, actions in some cases and reasonably that ought to be a basis for an adjustment in value notwithstanding the adjudication or the protection under Measure 50. It just makes sense, as something that increases the value, but it's an action already taken on the property."

Senate Hearing ¶ 45 (emphasis added).

### c. Conclusions as to RMV based on legislative history

The court must decide what light, if any, the legislative history shines on the question of whether the RMV of property affected by a subdivision or partition is capped by a previously adjudicated value pursuant to ORS 309.115. The court concludes that, although the committee members thought it inequitable to have a perpetual gap in assessed value between property whose value has been adjudicated and property whose value has not been adjudicated, the committee members also intended to preserve some protection of the adjudicated value statute, even when property is subdivided and all portions of the parcel are affected by the subdivision. The committee members apparently believed they were adopting a compromise when they approved language by which the previously frozen adjudicated value would be "adjusted," not subjected to a "wholesale revaluation," and only the "changes" in value that were "directly related" to the exception event (in this case, subdivision) would be taken into account in making this adjustment. The committee members clearly assumed that, as a fact matter, a partition, subdivision or rezoning would always cause an *increase* in RMV, and their main goal seemed to be to promote "equity," and to close a "loophole," by capturing at least the value of that increase, as discounted by the changed

---

[30] The Supreme Court later declared Measure 7 void due to violation of Article XVII, section 1, of the Oregon Constitution. *League of Oregon Cities v. State of Oregon*, 334 Or 645, 677, 56 P3d 892 (2002).

property ratio, in a new MAV. No one seemed to consider the possibility that a partition, subdivision or rezoning might occur that would "affect" the entire property but not directly cause an increase in RMV.

The court concludes that, consistent with the court's interpretation of the relevant statutory text and context, the committee members intended that the RMV of property that is within the protection of ORS 309.115 and is affected by a subdivision or partition be the sum of (a) the previously adjudicated value determined under ORS 309.115; (b) any positive or negative change in previously adjudicated RMV for reasons "directly related" to the subdivision, (*i.e.* changes reasonably related to the subdivision without any intervening space or time); and (c) the positive or negative effect of any other adjustments allowed by ORS 309.115(2). The sum of (a) through (c) may, depending on the facts, be greater or less than, or the same as, the previously adjudicated RMV or the new RMV as determined without regard to any previously adjudicated RMV.

4.   *Interaction with MAV*

The court now reviews how the resulting RMV applies within the statutory formula for recomputing MAV after a subdivision or partition, as set forth at the beginning of this order. This requires the court to determine which portions of property are considered "affected" by the subdivision or partition. ORS 308.156(7) requires the department to "provide by rule the method by which the allocations \* \* \* are to be made" as between the portions of property affected and not affected by the subdivision or partition. The department's rule, OAR 150-308-0190, materially unchanged since 2003, provides:

"For purposes of calculating the maximum assessed value when a property is subdivided or partitioned, the portion of the property that is 'affected' includes:

"(1)   The entire land that was subdivided or partitioned into smaller lots or parcels, if any.

"(2)   The improvements if one or more of the following apply:

"(a)   The act of subdividing or partitioning the land results in the apportionment of a single improvement (building or structure) to more than one tax lot.

"*Example 1:*   A lot improved with a duplex is partitioned such that the duplex is split into two single-family residences.

"(b)   The act of subdividing or partitioning the land changes the market's perception of the value of the improvements.

"*Example 2:*   A partition includes a vacant warehouse that was previously part of a large industrial complex. Prior to the partition, the market perceived the warehouse as unnecessary to the industrial complex and of little or no value. After the partition, the warehouse is a stand-alone improvement no longer associated with the industrial complex. The market now perceives the warehouse as a property that can be used for many different purposes with considerable value. By contrast, there is no change in market perception regarding the remaining improvements in the industrial complex.

"(c)   The improvements are divided into separate units of property.

"*Example 3:*   The legal subdivision of an apartment building into condominium units."

OAR 150-308-0190 (2017).[31] The rule purports to treat two kinds of property as *per se* "affected": land that is subdivided or partitioned (section (1)) and improvements apportioned to more than one tax lot or divided into separate units (section (2)(a) and (c)). Improvements not affected under the *per se* rules may still be affected if "[t]he act of subdividing or partitioning the land changes the market's perception of the value of the improvements" (section (2)(b)).

In this case, the parties agree that the declaration of condominium ownership filed on January 9, 2015, subdivided the Subject Property into nine units within the sole "building," plus 97 "parking units." The "parking units," would appear to be *per se* "affected" by the subdivision, either as bare land that was subdivided (section (1) of the rule) or as "improvements"

---

[31] OAR 150-308.156(5)-(A) (1998) was renumbered to OAR 150-308-0190 in 2016, but has not substantively been amended since 2003. The court uses the current numbering here for ease of future reference.

apportioned to more than one tax lot or divided into separate units of property (section (2)(c)). The building would appear to be *per se* affected by virtue of its having been divided into nine separate units of property (section (2)(c)).[32]

       Subject to any further factual development, the court tentatively concludes that application of the department's rule in this case causes a situation in which all of the Subject Property is "affected" by the subdivision pursuant to the *per se* provisions. Accordingly, a new MAV must be determined for the entire Subject Property. However, contrary to the department's argument that the Subject Property lost the protection of the adjudicated value statute simply because the property was subdivided,[33] the court

---

[32] The original version of the rule would have treated the entire Subject Property as "affected" *per se*:

    "When a property is subdivided or partitioned after January 1 of the assessment year preceding the current assessment year and before January 1 of the current assessment year, the entire property is affected and a new MAV is calculated for all property tax accounts."

OAR 150-308.156(5)-(A) (1998). The rule was next amended in 2001—the same year as HB 2205—without any material change for purposes of this case:

    "(1) For purposes of calculating maximum assessed value when a property is subdivided or partitioned, the portion of the property that is 'affected' includes:

    "(a) The entire land that was subdivided or partitioned into smaller lots or parcels, if any;

    "(b) The improvements that are divided into separate units of property, if any.

    "*Example:* The legal subdivision of an apartment building into condominium units."

OAR 150-308.156(5)-(A) (2001).

[33] To the extent the department's argument is based on equating "affected by" with "directly related to," the court rejects the argument as inconsistent with the text, context, and legislative history of ORS 309.115. The reference in statute and rule to property "affected by" a subdivision, partition or rezoning arose at the same time the department was litigating the meaning of "directly related" in *Willamette Egg Farms* and approximately 10 years after the department itself requested the insertion of "directly related" into the original text of ORS 309.115 following discussions with AOI. *See* HJR 85 (1997) (referring text to voters that later became Measure 50); Or Laws 1997, ch 541, § 13 (enacting ORS 308.156); *former* OAR 150-308.156(5)-(A) (1998) (original version of OAR 150-308-0190 containing phrase "affected by"); *Willamette Egg Farms, Inc.*, 14 OTR 337 (1998), *aff'd*, 331 Or 327 (2000). As of 2001, the court considers both the legislature and the department to have been well aware of the distinct meanings of those respective phrases. *See OR-OSHA v. CBI Services, Inc.*, 356 Or 577, 593, 341 P3d 701 (2014); *IAFF, Local 3564 v. City of Grants Pass*, 262 Or App 657, 662, 326 P3d 1214, (2014).

concludes that when determining the MAV of each new unit, ORS 309.115(2) requires the assessor to start with the previously adjudicated RMV of the Subject Property, and to adjust the RMV solely to account for changes in value "directly related" to the subdivision (*i.e.*, changes in value reasonably related to the subdivision without any intervening space or time), or any other adjustments allowed pursuant to ORS 309.115(2).[34] Taxpayers apparently seek to prove that no such changes in value occurred, which could result in a new MAV that is lower than the existing MAV.[35] The court denies the department's motion for summary judgment as to TC 5309. Taxpayers are entitled to an opportunity to present their expert testimony and other evidence in support of their claim.

## V.   CONCLUSION

Taxpayers rely on the RMV of the Subject Property as adjudicated for the 2014-15 tax year and contest the assessor's redetermination of RMV under the exception in ORS 309.115(2)(f). Taxpayers were required to appeal to the BOPTA before seeking review in the court, which is what they did in TC 5309. The court grants the department's motion as to TC 5308; however, pursuant to the court's prior order of consolidation, the court will hold TC 5308 in abeyance, and will not issue a judgment, pending this court's resolution of TC 5309.

As to TC 5309, the parties agree that the declaration of condominium ownership constituted a "subdivision" of the Subject Property for purposes of ORS 308.146(3) and Measure 50. Under that theory, the court concludes based

---

[34] On reply, the department also offers a legal theory pursuant to which the subdivision fundamentally changed the nature of the Subject Property, such that the pre-subdivision property "no longer exists." The department claims that, because the assessor was required to assign all new values to each subdivided property account, it would be "contrary to Oregon law" to seek to apply the pre-subdivision adjudicated RMV to the subdivided property. But if the department's theory were accurate, there would have been no need for ORS 309.115 (2)(f). HB 2205 (2001) would have been surplusage. The court declines to construe ORS 308.156(5) in a manner that would give no effect to ORS 309.115 (2)(f), a statute the legislature adopted precisely because of ORS 308.156(5). *See* ORS 174.010.

[35] In terms of the hypothetical amounts in Example 3 above, taxpayers seek to prove that the MAV has dropped from the $450,000 to $301,000.

on the relevant statutory text, context and legislative history that the RMV of the Subject Property is the sum of (a) the previously adjudicated value determined under ORS 309.115; (b) any positive or negative change in previously adjudicated RMV for reasons "directly related" to the subdivision (*i.e.*, changes reasonably related to the subdivision without any intervening space or time); and (c) the positive or negative effect of any other adjustments allowed by ORS 309.115(2). Now, therefore,

IT IS ORDERED that the Defendant's Motion for Summary Judgment is granted in part and denied in part.

IT IS FURTHER ORDERED that Case No. TC 5308 is held in abeyance pending further notification by the court.

The parties are directed to confer with each other and with the Clerk of the Court to set a date for trial in Case No. TC 5309.

APPENDIX 1

Tape Recording, House Committee on School Funding and Tax Fairness/Revenue, HB 2205, Jan 19, 2001, Tape 16, Side A, Minutes 24 to 45.

(1)    Chair Shetterly:   "We have an agenda today, our first dry run through some bills after several weeks of orientation—this ought to feel good, he said hopefully.

(2)    "*****

(3)    "Last one today on the agenda is House Bill 2205, opening a public hearing on that, and we have this time John Phillips on board. And Lizbeth do you want to give us a staff update?"

(4)    Lizbeth Martin-Mahar:   "Chairman Shetterly, members of the committee, I've given you a Staff Measure Summary of House Bill 2205, and that's a preliminary, and then a brief Revenue Impact Statement. What this bill is doing—House Bill 2205—is creating new exceptions when property tax accounts which are adjudicated, when they have an adjudicated real market value, when they can be increased. You have to have two particular events, one of two events that may occur on the property during that five-year adjudication period. There would have to be a rezoning and a change of use that is consistent with the zoning change, or a subdivision or a partitioning of the property. And it is applying to a change in the real market value made on or after the effective date of the bill.

(5)    "So just so you're aware of, since the changes with Measure 50 we've seen that the total number of property tax appeals with the board of property tax appeals decline significantly in this state to on an average about 7,135 accounts that are actually adjudicated each year. So, Measure 50 has really stabilized the assessed values and the taxes, in addition appeals of real market value do not oftentimes have an impact on the property and their taxes. So, this really does discourage appeals. *** What we're also seeing with appeals now—which hasn't really been so

much a change, but it's one of the reasons why there's not much of a revenue impact from this bill—is that you have about 63 percent of the property owners who are appealing their value are residential home owners, and they're not typically ones who will then be rezoning or subdividing their land once it has been adjudicated. So, \*\*\* House Bill 2205, it really only is [going to] pertain to a really small number of properties each year, so the revenue impact is minimal."

(6)   Chair Shetterly:   "Mr. Phillips."

(7)   John Phillips:   "Thank you, Chair Shetterly, members of the committee. My name is John Phillips, Department of Revenue's property tax division. House Bill 2205 is fundamentally, in our opinion, an equity in taxation bill. We have an old law that's been around quite a while, the adjudication statute. And we have Measure 50, which is relatively new. And each of them have to do with establishing a base for taxable value on property. But they handle them in two fundamentally different ways. I'd like to first talk about what the change is proposed, and then talk about the adjudication statute, and then go on to Measure 50's application to that.

(8)   "The bill essentially adds two conditions under which adjustments to adjudicated value can be made. One, for subdivisions and partitions, and two, as Lizbeth mentioned, for rezoning of property where that property is then used consistent with that zoning.

(9)   "Long, long ago and far, far away in a faraway county, there was a taxpayer—now I'm talking about the adjudication statute. And the taxpayer's value on their property was set at a certain amount, we'll just say at $130,000. And they looked at their tax statement and they said, 'That's pretty high. I don't think it's that, so I think I'm going to appeal.' So they appealed their property tax value, and they asked the court to reduce it to $100,000, and the court said, 'Well, I think it's worth $110,000.' So they received $20,000 of relief; the property value was lowered.

(10)     "The following year, the assessor looks at that property and says, 'I think my original opinion was correct. I think I'm gonna value it this year at $130,000 again.' And so the assessor increases the value on that property to $130,000. The taxpayer then says, 'Well, I'm having to go back and appeal this again. I may incur some costs. I may have to hire an attorney and get an additional appraisal.' And so what happened was that this was very burdensome on taxpayers, particularly residential taxpayers, who had to go every year and appeal their values. A very unfortunate situation.

(11)     "Then comes the adjudication statute, which says, 'We'd like to provide some protection for taxpayers. We'll allow that taxpayer five years in which they can count on the value that's adjudicated as determined by the court.' And so for five years the real market value is stabilized. After that, the assessor can make another determination, and we'll start all over again. But during that five-year period, there is that protection.

(12)     "The legislature, this committee, decided that there were conditions under which there should be adjustments to that adjudicated value, and those are spelled out in the statute. Let's say the property was bare land, and during the five years the taxpayer builds a home. It seemed reasonable, it is reasonable to expect that the value of their property would increase during that five-year adjudication; the property has changed.

(13)     "That's essentially the adjudicated value statute—it's a protection.

(14)     "Then comes Measure 50, and it also establishes a base of taxable value. And in your orientation you were told that's called maximum assessed value. That's the value on which the property is taxed. That value is allowed to grow at, as you were told, three percent, and then there are certain conditions under which that three percent can be exceeded. One of those conditions is if you have bare land and you build a home on it; the three percent can be exceeded for the new

construction. So in the adjudicated value statute, and in Measure 50, anytime there's new construction that reaches a certain threshold, then the taxable value can be increased.

(15) "What we're trying to do is to add two situations to adjust adjudicated value. They're allowed under Measure 50, but they're not allowed under the adjudication statute. And those two situations, like I said are subdivisions/partitions and rezoning of property.

(16) "So for example, we use the new construction example. Let's say you have a ten-acre parcel and you didn't appeal your value and you divide it into five two-acre parcels. Under Measure 50, the taxable value for that change is allowed to grow because now you have, maybe, five properties that are maybe buildable now and the value of those individual properties exceeds the total value of the ten-acre parcel. So, under Measure 50, the assessor is allowed to calculate the change in real market value and the corresponding change in taxable value.

(17) "If you take the same property under an adjudicated situation, you would have the ten-acre parcel, they would subdivide it into five two-acre parcels, and the assessor would not be able to make a change in the real market value of that property. Therefore, there would be no change in the taxable value of that property. After the five years that property would then come out of adjudication and the assessor would still not be able to make a change in the taxable value and would never be able to make a change. So, two ten-acre parcels side by side and one was adjudicated and one was not, the taxable value of those two properties would be, indefinitely into the future, different. And so, that's why I am characterizing this as an equity in taxation issue.

(18) "Lizbeth is correct, there's a lot of properties appealed and a there's a lot of properties that subdivide, but the number that are appealed and subdivide during that five-year period are relatively small.

(19) "And without getting deeper into it, which I could, are there any questions?"

(20) Rep. Beck: "Mr. Chair?"

(21) Chair Shetterly: "Representative Beck."

(22) Rep. Beck: "I want to get into our Tax 101 from earlier in the week—whenever that was—on real market versus assessed market value. This just applies to the real market value, or does it apply to the assessed market value under Measure 50?"

(23) Phillips: "This bill proposes a change to the adjudication statute, which sets and freezes, if you will, real market value."

(24) Rep. Beck: "Okay, but to keep following up here, the tax that someone pays is based on the assessed value that grows at three percent per year under Measure 50, so it won't affect the taxes. And real market value is the Measure 5—I'm repeating this to make sure I understand it."

(25) Phillips: "Right, and there's an odd link here. The adjudication statute won't allow the increase in real market value, and it doesn't talk about maximum assessed value, the taxable value part, you're absolutely correct. But when the assessor under Measure 50 goes to calculate that taxable value, the calculation is the real market value increase times—multiplied by—the changed property ratio, and I can go into that in detail, but if there's no change in real market value, then the answer is zero on the increase on the taxable value side. So, it isn't a restriction of growing the maximum assessed value, but the formula works out that it's a no-net increase."

(26) Chair Shetterly: "So is it similar to the situation where you have the comparable value of properties that the assessor uses to average the maximum assessed value?"

(27) Phillips: "Exactly."

(28) Rep. Beck: "So the real market value in the situations under this bill, for adjudicated cases, would be

allowed to increase, theoretically, and their taxable value would increase—"

(29)   Chair Shetterly:   "According to the formula—"

(30)   Rep. Beck:   "Because of the formula I'd forgotten about, right?"

(31)   Phillips:   "Yes."

(32)   Rep. Beck:   "The tax is not just based on the assessed value, it's based on the formula that involves the real market—okay. I'm thinking of all these graphs—"

(33)   Chair Shetterly:   "That formula establishes the maximum assessed value for the property."

(34)   Phillips:   "That's correct. And if I might follow up, certain words were chosen for very particular reasons. In the bill itself, it uses the word 'adjustment,' so it presumes that the part of the property that's not affected should not lose its protection for the adjudicated value. So if only a portion of the property is adjusted due to subdivision, partition or rezoning with consistent use, then that doesn't mean there's a wholesale revaluation of the property—that was our intent, not to do that. And the other words were 'directly affected,' and I think that's on line 19 of the bill, section 1: 'Changes directly related to the subdivision and partition,' so that other changes, not directly related to that, would not change the taxable value for that property."

(35)   Chair Shetterly:   "Any further questions?"

(36)   Rep. Witt:   "Mr. Chair?"

(37)   Chair Shetterly:   "Representative Witt."

(38)   Rep. Witt:   "I guess the question I have is if Measure 50 hadn't addressed these two specific circumstances, in which the value can be readjusted over and beyond what Measure 50 allows, would the Department have brought this bill?"

(39)   Phillips: "Chair Shetterly, Representative Witt, it's hard to speculate what the Department would have done if Measure 50 would have been written

differently, but I think—in my mind the change in the value was sufficient enough in the minds of those that crafted Measure 50, your committee, to feel that that was a reasonable condition under which taxable value should be increased. So it's persuasive to us that, if someone who hasn't appealed has their taxes increased, that someone who has appealed for the same conditions and with no difference, it seems like a fair solution to parallel those two provisions. So my answer to your question: probably not."

(40)  Rep. Witt:   "Follow-up: so the statute as it currently is written relative to adjudicated property apparently has a loophole if you compare it to the Measure 50 standard. Correct?"

(41)  Phillips:   "Chair Shetterly, Representative Witt, loophole, yes."

(42)  Rep. Witt:   "Yeah, certainly it is inconsistent when you compare it to the Measure 50 standard."

(43)  Phillips:   "That's correct."

(44)  Rep. Witt:   "And maybe you aren't able to answer this question, but if you put Measure 50 aside, I mean, is it the Department's opinion that this is appropriate and good tax policy relative to valuing property for property tax purposes?"

(45)  Phillips:   "Chair Shetterly, Representative Witt, the situation, if you set Measure 50 aside, well, prior to Measure 50 the taxable value was the real market value, so the protection for those properties that were subdivided, let's say, existed for the full five years, but after the fifth year, then the assessor would say, 'What is the real market value of this property,' and take into consideration the subdivision and raise that value up. If the taxpayer had a problem with that, they then appealed and the court would then look at that property and would say, 'What would, on the open market, a reasonable buyer and seller exchange this property for?' And there wasn't really an issue, but for those five years, under the old law."

(46)    Chair Shetterly:    "And we're saying under the current law now once that adjudicated property value is established, you don't have that catch-up then at the end of the five years—is that it? Under Measure 50?"

(47)    Phillips: "Chair Shetterly, that's exactly right. There's never a recoup."

(48)    Chair Shetterly:    "So two properties are identical * * * they're taxed at different values."

(49)    Phillips:   "Mm-hmm."

(50)    Chair Shetterly:   "I guess this is a Measure 50-driven problem."

(51)    Rep. Witt:    "Mr. Chair, I'm a little confused by that, because it seems to me the adjudication provision with the five-year protection specifically related to the fact that it was an adjudicated property. I mean, after that five years the Department could still come back in and revalue the property even with Measure 50 on the books—isn't that correct—to recognize these changes, subdividing and partitioning and zoning issues—to recognize those changes, to get a significant increase in the value of the property? So you would catch up after five years."

(52)    Phillips: "Chair Shetterly, Representative Witt, that's absolutely correct—the first part. And the second part I would comment on: After the five-year adjudication, under Measure 50 the assessor can go back in and revalue that property and set the real market value at what they feel is an appropriate amount, including the subdivision. But there's no trigger there than with the taxable value to track with that change. The maximum assessed value—the Measure 50 taxable value—has to be adjusted in the year subsequent to the change, whether the change is building a new home, subdivision or partition, or rezoning. So once that link is broken, then yes, the real market value is high, and the taxable assessed value is low, and it will always track then three percent only."

(53)  Rep. Witt:   "Even five years down the road, after the adjudication period has run out?"

(54)  Phillips:   "Correct."

(55)  Chair Shetterly:   "Representative Bates."

(56)  Rep. Bates:   "Yeah, I thought that was the case because you said those properties never catch up to each other. And I understand you're saying once that one-year link is broken, it's set.

(57)  "Let me ask you a question of potentially of something that could happen or maybe has happened. If I have a 100-acre tract and know that I am going to subdivide it in the next year or two, would it be worthwhile for me to ask for—go to court on it, get it adjudicated, then subdivide it, and permanently lower the tax on that?"

(58)  Phillips:  "Chair Shetterly, Representative Bates, that would be a strategy that might save you some tax money [laughter], but [I] don't want to get that on the record [laughter]."

(59)  Rep. Bates:   "And that's, and what I'm saying is that I'm afraid that could have happened and may be happening and this change would prevent that from happening."

(60)  Phillips:   "That's correct."

(61)  Rep. [_____]:  "*** same thing, particularly from our area, Representative Witt's area and mine, if you froze in a value in 1992, to 1999, I think it would be a huge savings. Given what property values have done."

(62)  Chair Shetterly:   "Representative Bates, I was just looking at the effective date, January 1 of next year—it looks like you've got time [laughter]."

(63)  *****

(64)  Rep. Bates:   "Mr. Chairman? Is this going to have a financial impact, I mean is this going to be a situation where people who have already broken that one-year time limit can go back and try to recapture that

and adjust those property values? Or is this going to affect things in the future, I mean is there a financial impact to individuals and to the state in general?"

(65) Phillips: "Chair Shetterly, Representative Bates, this is a strictly prospective change, so any conditions under which property was subdivided and the assessed value didn't track than with a similar property that was non-adjudicated, those properties will continue on at the assessed value that they're set at, and not ever experience an increase in that value, so this would have only a prospective effect."

(66) Rep. Bates: "Follow-up question. If those properties are sold, do we then pick them up on the assessed value change then?"

(67) Phillips: "Chair Shetterly, Representative Bates, no, the selling of property has absolutely no impact on that whatsoever. The conditions are strictly limited to three-percent growth in maximum assessed value, but for the exceptions of Measure 50, which include new construction."

(68) Rep. Bates: "I understand, I just wanted to be sure. Thank you."

(69) Chair Shetterly: "I can't believe we overlooked this. [Laughter] *** I tell you, I'm only too glad that this doesn't require a constitutional amendment. *** Is there any further testimony on House Bill 2205? Okay, thank you very much."

(70) [Close of the public hearing and opening of a work session on House Bill 2205.]

(71) Rep. Beck: "Chair?"

(72) Chair Shetterly: "Representative Beck."

(73) Rep. Beck: "I move House Bill 2205 to the floor with a do-pass recommendation."

(74) [Voting]

(75) Chair Shetterly: "I'll take this one; I'm the survivor of Measure 50."

APPENDIX 2

Tape Recording, Senate Committee on Revenue, HB 2205, Feb 7, 2001, Tape 34, Side B, Minutes 0 to 24.

\*\*\*\*\*

(1)    John Phillips:   "The adjudication statute, I'd like to describe that first. And what happened, a long time ago, in a county that will remain unnamed, a taxpayer got a tax bill, let's say on their residential property, for $150,000, and they felt that that value was too high, so they appealed their value and the court agreed with them and it was reduced to $100,000. Now the assessor in the following year felt that their value was correct in the very first place, so in the following year the assessor year raised the value back up to $150,000. And the taxpayer felt that the value should still be lower and then was forced to appeal again. And this went on and on and on, incurring costs, and possible attorney and possible appraisal issues. And so this law came about, known as the adjudication statute, which protected a taxpayer's value for five years, thus guaranteeing some sort of protection against increases in real market value, which at that time—this is pre Measure 50—increases in real market value was directly correlated to the taxable value: real market and taxable was the same thing at that time.

(2)    "There are certain exceptions in the adjudication statute. Let's say it was a bare land appeal. The taxpayer had bare land, they appealed it, the following year they build a new home. Then that would be considered an exception, and the protection doesn't last for five years for that situation. And there are other exceptions.

(3)    "But then Measure 50 came along. And what Measure 50 did was it set a base value *also*. In Measure 50, in your determination, was built in certain exceptions to the base value, such as new construction. A very similar and parallel-type exception to the adjudication statute. And so what we have is the situation where a

property is adjudicated and there's a new home built and the value is allowed to change due to that new home—the taxable value. And under Measure 50 we've got the same circumstance.

(4)  "But Measure 50 allows additional exceptions than are allowed under the adjudication statute. What this bill is trying to do is to add exceptions to the adjudication statute to make them in sync, so that if you can increase taxable value for Measure 50, constitutionally, you should be able to increase taxable value under the adjudication statute."

(5)  * * * * *

(6)  Chair Ferrioli:  "Colleagues, this bill seems to be relatively straightforward, allowing some flexibility, but we do have some questions. Senator Beyer?"

(7)  Sen. Beyer:  "Yeah. John, why not just repeal this thing[, *i.e.*, the adjudicated value statute]? Doesn't Measure 50 take care of it? If this wasn't on the books—and I realize this has been there a long time—but if you didn't have this on the books, wouldn't the adjustment standards that were in Measure 50 just naturally take care of the problem?"

(8)  Phillips:  "Chair Ferrioli, Senator Beyer, I think there are some other issues, primarily—and they're not all coming to mind right now, but the first one I think of is—the importance of real market value. The adjudication statute protects the real market value for those five years. And even though properties aren't generally, normally, taxed on the real market value, it does come into play in certain situations, specifically, the test for Measure 5. So if you have increases or decreases in the real market value, it could affect what we refer to as the 'compression.'"

(9)  Sen. Beyer:  [Unintelligible] "It's hard to think that one through, Mr. Chair, sorry."

(10)  Phillips:  "For me, I visualize a tax statement, and the real market value and assessed value being significantly different—"

(11)   Sen. Beyer:   "Give me an example of where this might occur. I suspect it's more in the commercial and industrial area rather than in residential."

(12)   Phillips: "This type of situation would primarily occur on residential because the subdivisions, as Lizbeth was mentioning in the orientation, is primarily on land that's going to be subdivided and it may or may not be commercial, but *** let's say you have a ten-acre parcel and you want to divide that parcel into five two-acre lots, the market views the value of those subdivided lots as greater than the whole, and so if a property is subdivided such as that, then if there were no appeal, the assessor would reappraise those properties in the following year, the real market value would be increased, and instead of $10,000 for the ten-acre tract it might be $20,000 distributed among the five parcels."

(13)   Sen. Beyer:   "So how would Measure 50—you know, *this* law standing aside—how would Measure 50 treat that?"

(14)   Phillips:   "Measure 50 would treat that as an exception to the limit of maximum assessed value. Maximum assessed value is that rollback of value to '95 minus 10 percent, and it's allowed under statute and constitution to grow at three percent per year unless certain situations occur. One of those being new construction, another one [being] subdivisions or partitions. So, the assessor then would say what's the difference in real market value between the property prior to subdivision, after subdivision, and you would take the difference in real market value on each property, multiply it by what we call the changed property ratio, *** it simulates the rollback, and so real market value is increased but the taxable obligation of that property or that property owner is not increased proportionally, but it does track."

(15)   Sen. Beyer:   "So what this does is *** a voluntary action by the property owner, which increased the value of their asset, and it then says, equal system,

you are taxed on that new value consistent with all other taxpayers. What this does is allows the taxpayer to adjudicate that and get it set at, frozen at, the prior level, as if it were not subdivided?"

(16) Phillips: "Chair Ferrioli, Senator Beyer, what the real crux of the problem is, is that the property that I described, the 10-acre parcel that's then the value is increased because of the subdivision, the formula for increasing the taxable value is the increase in real market value multiplied by the changed property ratio, increases the taxable value by that much. On the same property under adjudication, you take the change in real market value due to the subdivision, multiplied by the changed property ratio, but the adjudication statute does not allow the real market value to increase, so it's essentially, the formula is zero multiplied by the changed property ratio equals no increase in taxable value. So you've got the two ten-acre parcels, both subdivided, one's adjudicated, one's not. And one has an increase in taxable value, the other doesn't, and then when the five years lapse, they go on, perpetually, at different taxable values."

(17) Sen. Beyer: "This law, what we're doing here, the old law preserves the right of that tax advantage to the property owner who subdivided their land?"

(18) *****

(19) Sen. Witt: "Obviously, if you're in a position where you're situated and you have this occurrence where you've subdivided your property, current statute prevents that increase in real market value, which keeps your taxes lower."

(20) Sen. [_____]: "Forever."

(21) Sen. Witt: "Well, yeah, in perpetuity. So that's an advantage to people who subdivide and build low-income housing and other kinds of things ***. But so I guess if the committee chooses to pass the bill, even though we're making it consistent with Measure 50 in the Constitution, we are perhaps causing certain

individuals who might subdivide their properties and invest resources, who take advantage of this 'loophole,' so to speak, causing them to have to pay higher taxes, so—"

(22)  Sen. [_____]:  "I thought it was the other way around."

(23)  Sen. [_____]:  "Yeah, except as I understand it the Measure 50 exception would be: if you decide to take some action that increases your value, you fall under the exceptions. The fact is that Measure 50 and * * * existing statute—maybe they're not in direct conflict, but they're certainly not synchronous."

(24)  Sen. Beyer:  "Mr. Chair, that's at the heart of the issue. I'm not clear whether this—the change being proposed here—preserves that tax advantage, or takes it away."

(25)  Phillips:  "Chair, Senator Beyer, what this does is, it allows— What the protection of the adjudicated statute does is, it actually does more than it did prior to Measure 50. It protects not only that real market value for five years, but it can, under the changes mentioned in the bill, allow that property's taxable value *not* to increase. So under the current law, those properties, albeit very few, get an advantage in perpetuity."

(26)  Sen. Beyer:  "That's what I thought. It sets that lower value in place in perpetuity—"

(27)  Phillips:  "It would never be increased."

(28)  Sen. Witt:  "And isn't that a tax advantage * * *?"

(29)  Sen. [_____]:  "Oh, yeah, I think your characterization is accurate on that."

(30)  Sen. Witt:  "So this could be viewed as a tax increase bill."

(31)  * * * * *

(32)  Sen. George:  "Mr. Chairman, at the bottom of one of our reports, it says: 'This measure will add a minimal amount of additional taxes to the counties' tax rolls

annually.' But up above—I'm trying to get a balance on this—it also says the advantage to that taxpayer would be that, if in fact they have an adjudicated value established, that's what it's gonna be. They're protected—well, I'll just read it. It says, 'This protects the taxpayer from unwarranted value increases that must be appealed again, following—.' Apparently, somebody ignored adjudication. So it looks like there's kind of a plus and a minus to taxpayers. It does make it worse, it looks like."

(33)  Phillips:   "Chair Ferrioli, Senator George, it does—we tried to draft it so it does retain the protections of the adjudicated value for the property that's unchanged. The issue would be is that if you just changed a small portion of your property then all of the property shouldn't necessarily be changed. You should retain your protection under the adjudication statute. And in the bill, actually, if I might point out on line 10, the word toward the end of line 10 on page 1 says 'adjustments,' and so 'adjustments' are allowed under this bill, not a wholesale revaluation of the property, but just adjustments. And then down below on lines 19 and 20, the sections we're adding, the words we're adding use the words 'changes directly related.' So that if you have a large property and you subdivide— or partition I should say—one acre off of it, that all of the buildings don't necessary get revalued. This is just relating to the property that's changed. So, to answer your question, I think it does retain the protections of adjudicated value but it does remove two to make them consistent with Measure 50."

(34)  Sen. Beyer:   "Does this make the Department's life easier?"

(35)  Phillips:   "Chair Ferrioli, Senator Beyer, it doesn't really affect our administration of the property tax system. It's just an equity in taxation issue that we see similar properties being treated differently."

(36)  Sen. Beyer:   "And that would be inequitable, and therefore [inaudible] unconstitutional."

(37)   Sen. [_____]:   "They'd be treated unequally in the future, too, under this, but it's probably so minor that—"

(38)   \*\*\*\*\*

(39)   Chair Ferrioli:   "Well, it appears to be just a process of conciliation between Measure 50 and existing portions of the old law. And what occurred to me is, will this have any connection, because it's rezoning and valuation changes, will there be any implications, for instance, when Measure 7's full implications are known [under] the Attorney General's interpretation? In other words, we act on this today, is there likely to be any implications that you can foresee coming out of Measure 7?"

(40)   \*\*\*\*\*

(41)   Phillips:   "Chair Ferrioli, we've looked at it, we haven't gotten an Attorney General opinion on that issue, but we can see that, depending on what a person does with their property, their value will be appraised by the assessor and it should—I'm not aware of any effect."

(42)   \*\*\*\*\*

(43)   Chair Ferrioli:   "Any questions—further questions? Any other person here present wishing to testify on House Bill 2205? \*\*\* Colleagues, let's have some discussion on this bill. It seems to me to simply be a housekeeping amendment to coincide the old statute with the actions of Measure 50. In response to a reasonable question from Senator Beyer, is there any reason to have this statute remain on the books, and the answer is yes, there are certain valuation situations that do come into play, so a simple repeal of the adjudication process in favor of Measure 50's adjudication process is not warranted—good question, Senator. I see no reason, if the agency feels that this conciliation is necessary, not to move the bill forward. I am vaguely disquieted by the idea that anything having to do with valuation and rezoning may be implicated,

or that there may be implications for Measure 7, I don't know what they'd be."

(44) Sen. [_____]: "Actually, Mr. Chair, there shouldn't be any negative side, because actually, it's not a big deal, I guess I don't have a lot of concern about it. But it's an advantage, not a disadvantage, to somebody going through this process because it preserves a lower tax value in perpetuity, which should *add* to their property's value, not take it away."

(45) Chair Ferrioli: "And certainly rezoning, and use consistent with that rezoning, your subdivision added value, or value added, actions in some cases and reasonably that ought to be a basis for an adjustment in value notwithstanding the adjudication or the protection under Measure 50. It just makes sense, as something that increases the value, but it's an action already taken on the property. But the protection that artificially holds the value down is at least arguably unreasonable. Questions?"

(46) Sen. [_____]: "Mr. Chair, you make a good argument. I'm not exactly sure why you brought up Measure 7, but it seems to me that Senator Beyer is right, that to the extent you increase the value of the property, and the government somehow comes along and changes the value or devaluates it, you increase the potential obligation of the municipality in that devaluation or taking, so—"

(47) \* \* \* \* \*

(48) Chair Ferrioli: "Colleagues, if we could go into work session on this thing, my inclination is to do that, because I think the agency has brought the issue, it coincides Measure 50 with the older law by changing the older law, it adds rezoning and subdivision as a basis for adjudication and adjustments. That seems reasonable to the chairman. Any other questions?"

(49) \* \* \* \* \*

(50) Chair Ferrioli: "We're in a work session on House Bill 2205."

(51)  Sen. Beyer:  "Mr. Chair?"

(52)  Chair Ferrioli:  "Senator Beyer."

(53)  Sen. Beyer:  "Move House Bill 2205 to the floor with a do-pass."

(54)  Chair Ferrioli:  "The Vice-Chair moves House Bill 2205 to the floor with a do-pass. Any questions? Any objections to the motion? Seeing none, so ordered."